## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| LEONTTAYY AMIR PRATT, | : | |
| LAMONT ROBINSON, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION NO. 20-0171 |
| MICHAEL OTT, Deputy Warden of | : | |
| Operations, Lebanon County Correctional | : | (WILSON, J.) |
| Facility; TINA LITZ, Deputy Warden of | : | |
| Treatment, Lebanon County Correctional | : | JURY TRIAL DEMANDED |
| Facility; ROBERT J. KARNES, Warden, | : | |
| Lebanon Correctional Facility; | : | |
| JOSEPH WHEELER, Captain of Security, | : | |
| Lebanon County Correctional Facility; | : | |
| LEBANON COUNTY; | : | |
| | : | |
| Defendants. | : | |

_____:

## AMENDED COMPLAINT

Lebanon County Correctional Facility held Plaintiffs Leonttayy Amir Pratt and Lamont Robinson in solitary confinement for months solely because they refused to cut off their dreadlocks—an act that would violate their Rastafarian religious beliefs. Lebanon County's policy and practice of punishing people who refused to cut off their dreadlocks, without allowing for religious exemptions and while permitting people with other types of hair to keep their hair long, violated Mr. Pratt's and Mr. Robinson's rights under the First and Fourteenth Amendments of the

United States Constitution and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1. Mr. Pratt and Mr. Robinson bring this action for injunctive relief and damages.

## JURISDICTION AND VENUE

1.      Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 2201 and 2202, and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1.

2.      The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in Lebanon County, Pennsylvania, in the Middle District of Pennsylvania.

## PARTIES

4.      Plaintiff Leonttayy Amir Pratt is an adult Black man currently incarcerated at the Lebanon County Correctional Facility ("LCCF") as a pretrial detainee.

5.      Plaintiff Lamont Robinson is an adult Black man currently incarcerated at LCCF as an alleged parole violator.

6.      Defendant Michael Ott is employed as the Deputy Warden of Operations at LCCF. His responsibilities include serving on the Classification

Committee and reviewing placements in administrative segregation. He is sued in his individual and official capacities.

7.     Defendant Tina Litz is employed as the Deputy Warden of Treatment at LCCF. Her responsibilities include serving on the Classification Committee, which reviews placements in Administrative Segregation, and responding to prisoners' written grievances. She is sued in her individual and official capacities.

8.     Defendant Robert J. Karnes is the Warden of LCCF. He is the chief executive officer of LCCF, approves all LCCF policies, and is the jail's final policymaking authority. He is responsible for the oversight, operation and administration of the LCCF. He is responsible for approving all placements in Administrative Segregation and responding to prisoners' grievance appeals. He is sued in his individual and official capacities.

9.     Defendant Joseph Wheeler is employed as the Captain of Security at LCCF. He is the highest-ranking uniformed officer at LCCF and reviews all of the jail's policies and procedures. He is sued in his individual and official capacities.

10.    Defendant Lebanon County is a county of the fifth class in Pennsylvania and operates LCCF, a county jail. Lebanon County and LCCF receive federal financial assistance.

11.    All Defendants were acting and continue to act under color of state law.

3

# FACTS

## Dreadlocks and Rastafarianism

12.     Dreadlocks is a manner of wearing hair that is common for Black people and suitable for Black hair textures.

13.     Dreadlocks form naturally, without any manipulation, in some Black people's hair.

14.     Once hair has naturally formed dreadlocks, it cannot be taken out of dreadlocks; the only way to "remove" natural dreadlocks is to cut them off.

15.     Rastafari, or Rastafarianism, is an Abrahamic religion that developed in Jamaica in the 1930s.

16.     Rastafari, which is deeply influenced by Judeo-Christian theology, is based on an Afrocentric interpretation of the Bible.

17.     Some Rastafarians describe themselves as Christian.

18.     Rastafari has adherents throughout the world. Most Rastafarians are of Black African descent.

19.     Growing their hair in long dreadlocks is central to many Rastafarians' religious expression.

20.     The importance of dreadlocks for Rastafarians stems in part from the "nazirite vow" taken by Samson in the Bible, which requires that adherents avoid cutting their hair.

21.     Rastafarians view dreadlocks as a symbol of strength and a means of connecting more closely with God.

22.     Some Rastafarians also believe that their dreadlocks connect them with their ancestors and family members who have died.

## LCCF's Prohibition of Dreadlocks – Before April 23, 2020

23.     The Rules and Regulations in effect at LCCF from before the start of Plaintiffs' incarceration through April 23, 2020 prohibited people incarcerated at LCCF from wearing their hair in braids or cornrows, two hairstyles that are frequently worn by Black people.

24.     The Rules and Regulations allowed incarcerated people to have other forms of long hair as long as it was tied up or worn in a single pony tail.

25.     The Rules and Regulations given to Plaintiffs and other people at LCCF did not explicitly prohibit dreadlocks, as dreadlocks are not a form of braids.

26.     Nonetheless, Defendants have a policy, custom, and practice of punishing people who refuse to cut their dreadlocks off by housing them in the Security Housing Unit ("SHU"), a form of solitary confinement.

27.     Defendant Karnes stated in writing that dreadlocks were "considered to be 'braids' for purposes of application of LCCF policy."

28.     Defendant Ott, on the other hand, stated in writing that "the issue of dreadlocks was added after th[e] handbook was printed."

29.     Defendants did not permit people in LCCF to have dreadlocks even if they were tied up or worn in a ponytail.

30.     Prior to April 23, 2020, LCCF did not allow for religious exceptions to its rule against dreadlocks.

31.     Defendants consider placement in the SHU for refusal to cut dreadlocks to be a form of "administrative segregation."

32.     According to LCCF's Rules and Regulations, a prisoner can only be placed in administrative segregation at the discretion of the Warden or his designee.

33.     Defendant Karnes has stated that LCCF's prohibition against braids, cornrows, and dreadlocks is due to "inmates' ability to hide contraband and to ensure cleanliness in the correctional facility."

34.     Dreadlocks are not inherently any less clean than any other hairstyle, and they can be kept as clean as hair styled any other way.

35.     Upon information and belief, LCCF's hair policies are not a result of any incidents involving LCCF prisoners hiding contraband in their hair or any other security problems posed by prisoners with dreadlocks.

36.     Any potential risk of people hiding contraband in dreadlocks could easily be addressed through the use of searches.

37.     Dozens of jail and prison systems across the United States, including the United States Bureau of Prisons and the Pennsylvania Department of Corrections, permit prisoners to have dreadlocks.

38.     In 2019 and/or early 2020, there were at least two prisoners with dreadlocks at LCCF who were housed in general population rather than in the SHU.

39.     On or around February 15, 2020, Defendant Wheeler and other LCCF correctional officers entered one or more housing units to search for people with dreadlocks.

40.     Defendant Wheeler and the other correctional officers went from room to room and ordered all of the non-white people to remove their hats and shake out their hair, so staff could check for dreadlocks.

41.     White people were not required to remove their hats, and the correctional officers did not check to see whether they had dreadlocks or other prohibited hairstyles.

42.     People of color who were found to have braids or dreadlocks were told they had to cut them off by 3:00 P.M. the next day or else they would be placed in the SHU.

## LCCF's New Hair Regulations

43.     On April 23, 2020, Defendant Karnes announced to all LCCF inmates and staff that the Lebanon County Prison Board had promulgated new inmate hair regulations, which were effective immediately.

44.     Like the prior regulations, the new hair regulations single out and prohibit certain natural Black hairstyles.

45.     Specifically, the new hair regulations prohibit inmates from "wear[ing] their hair in braids, dreadlocks, cornrows or other similar styles that present security or hygiene concerns."

46.     The new hair regulations permit other forms of long hair, stating that "[i]nmates are not restricted with regard to the length of their hair, but an inmate with long hair is only permitted to wear his or her hair 'up' by having it in hair ties or a single ponytail."

47.     Unlike under the prior policy and practice, under the new hair regulations, "inmates who have sincerely held religious beliefs requiring them to wear their hair in a style otherwise prohibited under this policy may request an exception."

48.     People with dreadlocks in LCCF who do not request or are not granted a religious exception are still required to cut their dreadlocks off or remain in the SHU indefinitely.

**Conditions in the SHU**

49.    Solitary confinement, known by many names, refers to the practice of holding an incarcerated person in a cell between 22 and 24 hours per day, alone or with a cellmate, isolated from normal social interaction with others, and subjected to severe restrictions impacting every aspect of their lives.

50.    As noted by the Chief Judge of the United States District Court for the Middle District of Pennsylvania, "[r]esearchers have observed that 'psychological stressors such as isolation can be as clinically distressing as physical torture.'" *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 779 (M.D. Pa. 2016) (quoting Jeffrey L. Metzner, M.D., et al., *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psychiatry & Law 104, 104 (2010)).

51.    The United Nations has long recognized prolonged solitary confinement, for any duration over 15 days, as a form of torture that is banned under the Mandela Rules.

52.    The SHU at LCCF houses prisoners who are in "administrative segregation" as well as those who are in "disciplinary confinement" as punishment for violating prison rules.

53.    When housed in the SHU, Plaintiffs were subject to all of the same restrictions as prisoners who are in disciplinary confinement.

9

54.     In the SHU, Plaintiffs were given a maximum of one hour of recreation five days per week.

55.     Recreation is outside except when it is raining or snowing. If Plaintiffs chose not to go outside, they were only given 20 minutes of indoor recreation.

56.     These recreation periods were provided between 12:00 A.M. and 2:00 A.M., at most five days a week.

57.     These were the only times Plaintiffs were permitted to use the phone, which made it extremely difficult for them to stay in touch with their families, given the late hour.

58.     On Wednesdays and Thursdays, Plaintiffs were only allowed out of their cell for five minutes a day.

59.     In general population, prisoners receive far more out-of-cell time, and the out of cell time occurs during daylight hours, allowing people to communicate more easily with their families.

60.     In general population, some prisoners are housed in dorm-style units housing up to eight people.

61.     In the SHU, the lights are kept on at all hours, with the exception of 10:00 P.M. – 12:00 A.M.; sometimes the lights are kept on 24 hours a day.

62.     On at least one occasion during Plaintiffs' confinement in the SHU, the lights were on for approximately 96 consecutive hours.

10

63.     In general population, the lights are turned off at night.

64.     In the SHU, Plaintiffs ate all their meals in their cells, while general population prisoners are permitted to eat one to two meals a day outside of their cells.

65.     Plaintiffs were sometimes forced to eat in their cells when there was urine or feces in the toilet that could not be flushed, as the toilets lock from flushing for an hour if they are flushed twice in five minutes.

66.     Plaintiffs were not permitted to receive books from outside the prison, while prisoners in general population can have books shipped to them by friends and family.

67.     Plaintiffs were only permitted to order certain hygiene and clothing items from commissary; unlike prisoners in general population, they were not permitted to order food from commissary.

68.     Plaintiffs were only permitted one visit per week, which could last a maximum of 30 minutes, while some prisoners in general population are permitted up to three visits each week, each of which can last up to 150 minutes.

69.     Unlike prisoners in general population, Plaintiffs were not permitted to receive photographs in the mail.

70.   The SHU is much dirtier than general population, as SHU prisoners are not given equipment and materials with which to clean their cells. Instead, staff clean the SHU cells once a month.

71.   The corridor outside the SHU cells is also much dirtier than general population, as SHU prisoners are instructed to put their trash, including their food waste, in the hallway, where it stays until inmate workers come and pick it up.

### Plaintiff Pratt's Confinement in the SHU

72.   Mr. Pratt is Rastafarian and has been his entire life.

73.   He started growing his hair in dreadlocks in 2013.

74.   Mr. Pratt cut off his dreadlocks and started growing them again in June 2017 to mark the stillbirth of his son.

75.   Mr. Pratt's dreadlocks are about eight inches long.

76.   Mr. Pratt keeps his hair in dreadlocks in accordance with his Rastafarian religious beliefs.

77.   Mr. Pratt's dreadlocks have additional religious significance to him because he began growing them to mark the stillbirth of his son.

78.   Cutting off his dreadlocks would violate Mr. Pratt's religious beliefs.

79.   Mr. Pratt was diagnosed with Anxiety and Depression when he was in his 20s, prior to his incarceration at LCCF, and is currently taking prescription medications for these conditions

80. Mr. Pratt was admitted to LCCF on November 21, 2019.

81. The next day, November 22, 2019, Mr. Pratt was placed in the SHU, where he remained until April 23, 2020.

82. The sole reason for Mr. Pratt's placement in the SHU was his refusal to cut off his dreadlocks.

83. Mr. Pratt was not cited for violating any LCCF rules prior to his placement in the SHU.

84. He did not have a misconduct hearing or any other opportunity to formally contest his placement in the SHU.

85. Nonetheless, Mr. Pratt was punished with indefinite solitary confinement as a result of his refusal to conform to LCCF's policy prohibiting dreadlocks.

86. Defendants Ott, Litz, Karnes, and Wheeler all approved of Mr. Pratt's placement in the SHU as punishment for his refusal to cut off his dreadlocks.

87. Defendants Ott, Litz, and Wheeler, as well as other LCCF staff members, told Mr. Pratt that the only way he would be transferred out of the SHU was if he cuts his dreadlocks off.

88. Mr. Pratt offered to tie his hair up multiple times, but Defendants and other staff members told him he would remain in the SHU even if his hair was tied up or back.

89.   On or around February 20, 2020, Mr. Pratt spoke with Defendant Ott about his situation.

90.   Defendant Ott told Mr. Pratt that LCCF's prohibition of dreadlocks would continue and that the only way Mr. Pratt would be transferred out of the SHU was if he cut his dreadlocks off.

91.   Mr. Pratt was confined in the SHU for approximately 153 days, longer than is typical in LCCF even for serious misconduct violations.

92.   For example, according to LCCF's Rules and Regulations, the estimated sentences for intoxication, fighting, and threatening an employee with bodily harm range from 30 to 120 days.

93.   Prior to arriving at LCCF, Mr. Pratt was incarcerated at the Camden County Jail in New Jersey and in a state prison operated by the New Jersey Department of Corrections.

94.   Mr. Pratt was permitted to have dreadlocks the entire time he was in both facilities without punishment or other adverse consequences.

95.   Mr. Pratt has severe back problems from a bus accident he was in as a child and from a gunshot injury he suffered in 2014, and he has a bullet lodged near his ribs.

96.     As a result of these injuries and his placement in the SHU, Mr. Pratt experienced near-constant pain from the back of his upper legs through his back and into his shoulders.

97.     The severe restrictions on his mobility caused by his placement in the SHU exacerbated Mr. Pratt's pain, as being forced to sit or lie down for extended periods of time makes the pain worse.

98.     Physical exercise, including running and walking, are therapeutic for Mr. Pratt, but while in the SHU, his opportunities for exercise were severely limited.

99.     Mr. Pratt's injuries require physical therapy, but he was told by LCCF medical staff that, due to his placement in the SHU, he was not permitted to be in the gym or a physical therapy office without shackles on and, thus, could not receive physical therapy.

100.    During his incarceration in Camden County Jail, Mr. Pratt was provided with multiple mattresses and a wedge pillow to elevate his head, but LCCF staff did not provide Mr. Pratt with these items or any other accommodations for his injuries until on or around March 12, 2020.

101.    Mr. Pratt's time in the SHU was also detrimental to his mental health.

102.    As a result of his confinement in the SHU, Mr. Pratt's mental health deteriorated, resulting in feelings of hopelessness, decreased patience, irritability, constant negative thoughts, and loss of interest in showering, shaving, and talking.

15

103.   Mr. Pratt's deteriorating mental health had multiple physical manifestations, including frequent headaches, frequent chest pain, high blood pressure, constipation, hair loss, and weight loss. Mr. Pratt lost over 30 pounds during his time in the SHU.

104.   Mr. Pratt asked staff for psychological therapy on numerous occasions during his time in the SHU but was told it was unavailable.

105.   Pursuant to LCCF's new hair regulations, on April 23, 2020, Mr. Pratt was released from the SHU and transferred to general population without having to cut off his dreadlocks.

## Plaintiff Robinson's Confinement in the SHU

106.   Mr. Robinson is Rastafarian and has been since 2016.

107.   Mr. Robinson considers his faith to be a form of Christianity.

108.   Mr. Robinson has dreadlocks that grow just past his shoulders.

109.   Mr. Robinson started growing his hair in dreadlocks on July 6, 2016, after his identical twin brother died.

110.   Mr. Robinson's brother was Rastafarian and had dreadlocks.

111.   When his brother died, Mr. Robinson began trying to emulate him, including by adopting his Rastafarian religious beliefs and practices and following his career path in healthcare.

16

112.   Mr. Robinson keeps his hair in dreadlocks in accordance with the nazirite vow.

113.   Mr. Robinson believes that his dreadlocks keep him connected with his brother and with God.

114.   Mr. Robinson's hair is a fundamental aspect of his spirituality.

115.   For Mr. Robinson, cutting his dreadlocks off would violate his religious beliefs and make him feel like he was severing his spiritual connection with his brother and with God.

116.   Mr. Robinson was diagnosed with Post-Traumatic Stress Disorder as a teenager and, later in life, was diagnosed with General Anxiety Disorder. He has been prescribed medications, including Seroquel, for these conditions.

117.   Mr. Robinson was admitted to LCCF on October 30, 2019.

118.   Despite having dreadlocks, Mr. Robinson was housed in general population.

119.   He was aware of LCCF's policy and practice of housing people with dreadlocks in solitary confinement, so he concealed his dreadlocks under a hat.

120.   Mr. Robinson was constantly worried about his dreadlocks being discovered, which caused him great anxiety.

121.   During this time, as a result of stress and his hair being covered, some of Mr. Robinson's hair fell out.

122.   During his time in general population, LCCF staff never searched Mr. Robinson's hair.

123.   On or around February 15, 2020, Defendant Wheeler and other correctional officers entered the upper tier of Cell Block Six, the dormitory-style unit where Mr. Robinson was housed, and ordered him and the other non-white men to remove their hats and shake out their hair, so staff could determine whether they had dreadlocks.

124.   White men were not ordered to remove their hats or shake out their hair.

125.   Defendant Wheeler told Mr. Robinson that if he did not cut his dreadlocks off by 3:00 P.M. the next day he would go to the SHU.

126.   Mr. Robinson told Defendant Wheeler that he was Rastafarian and that it would violate his religious beliefs to cut his dreadlocks off. Defendant Wheeler said he did not care and that Mr. Robinson would still go to the SHU if he did not cut his dreadlocks off.

127.   The next day, staff returned, and Mr. Robinson again informed them he would not cut his dreadlocks off.

128.   Mr. Robinson was taken to the jail's mental health unit, and then, on or around February 17, 2020, Mr. Robinson was placed in the SHU, where he remained until approximately May 18, 2020.

129.   The sole reason for Mr. Robinson's placement in the SHU was his refusal to cut off his dreadlocks. He remained in the SHU for this reason for approximately 67 days.

130.   Mr. Robinson was not cited for violating any LCCF rules prior to his placement in the SHU.

131.   He did not have a misconduct hearing or any other opportunity to formally contest his placement in the SHU.

132.   Nonetheless, Mr. Robinson was punished with indefinite solitary confinement as a result of his refusal to conform to LCCF's policy prohibiting dreadlocks.

133.   Defendants Ott, Litz, Karnes, and Wheeler all approved of Mr. Robinson's placement and continued confinement in the SHU as punishment for his refusal to cut off his dreadlocks.

134.   In addition to being subjected to all of the SHU conditions described above (*see supra*, ¶¶ 49-71), Mr. Robinson was in a cell with no seat from approximately February 17 through March 27, 2020, and thus ate his meals and wrote letters while sitting on the floor.

135.   Knowing that other people in the SHU had seats in their cells, Mr. Robinson repeatedly complained to staff about not having a seat in his cell and asked to be moved to a cell with a seat. Staff refused these requests for over a month.

136.   On one occasion, Defendant Wheeler responded to Mr. Robinson's complaints about not having a seat in his cell by telling Mr. Robinson that he gave him an opportunity to cut his hair and, since he chose not to, this was the result.

137.   Mr. Robinson's mental health deteriorated during his time in the SHU, manifesting in feelings of stress, paranoia, anxiety, depression, irritability, and isolation.

138.   Prior to his time in the SHU, Mr. Robinson spoke to family nearly every day, but he was unable to speak to them regularly when he was in the SHU.

139.   The near-constant illumination in the SHU caused Mr. Robinson to experience sleep deprivation.

140.   While in the SHU, Mr. Robinson experienced frequent anxiety attacks, accompanied by physical symptoms including increased heart rate and sweats. Mr. Robinson describes his anxiety as feeling like a physical weight that he needs to get out.

141.   As a result of his deteriorating mental health, Mr. Robinson experienced weight loss, losing at least 15 pounds during his time in the SHU.

142.   Upon information and belief, Mr. Robinson was transferred from the SHU to general population on or around May 18, 2020, pursuant to LCCF's new hair regulations.

143.   Mr. Robinson was not transferred out of the SHU on April 23, 2020 when the new hair regulations took effect because, on April 17, 2020, he was given a 30-day SHU sentence for a misconduct citation.

144.   This was the first misconduct citation Mr. Robinson received at LCCF and was a result of the exacerbated anxiety he was experiencing due to his unlawful placement in solitary confinement.[1]

## CAUSES OF ACTION

### Count I: Violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1
(against all individual Defendants in their official capacities and Defendant Lebanon County)

145.   Plaintiffs incorporate the allegations contained in each of the preceding paragraphs as if fully set forth herein.

146.   By requiring that Mr. Pratt and Mr. Robinson either remain in solitary confinement or cut off their dreadlocks, Defendants imposed a substantial burden on Mr. Pratt's and Mr. Robinson's practice of their Rastafarian religious beliefs.

---

[1] Mr. Robinson was cited for "Refusing orders" and "Disrespect of staff" after he repeatedly complained to Defendant Litz about the constant illumination in the SHU. Frustrated with her response, Mr. Robinson punched a wall, causing his hand to bleed and swell. Mr. Robinson and Defendant Litz exchanged disrespectful words, and staff failed to provide Mr. Robinson with treatment for his injury.

147.   Defendants' requirement that Mr. Pratt and Mr. Robinson remain in solitary confinement if they did not cut off their dreadlocks was not the least restrictive means of furthering any compelling government interest.

## Count II: Deprivation of First Amendment Right to Free Exercise of Religion
(against all Defendants)

148.   Plaintiffs incorporate the allegations contained in each of the preceding paragraphs as if fully set forth herein.

149.   By keeping Mr. Pratt and Mr. Robinson in solitary confinement because they refused to cut off their dreadlocks, Defendants inhibited their right to free exercise of religion for no legitimate penological purpose.

## Count III: Violation of the Due Process Clause of the Fourteenth Amendment: Substantive Due Process
(against all Defendants)

150.   Plaintiffs incorporate the allegations contained in each of the preceding paragraphs as if fully set forth herein.

151.   As pretrial detainees, Mr. Pratt and Mr. Robinson have a right to be free from punishment.

152.   The individual Defendants chose to keep Mr. Pratt and Mr. Robinson in solitary confinement in order to punish them.

153.   Defendants' policy and custom of requiring Mr. Pratt and Mr. Robinson to either cut off their dreadlocks or remain in solitary confinement was not rationally related to any legitimate non-punitive government purpose.

154.   To the extent Defendants' treatment of Mr. Pratt and Mr. Robinson bore some rational relationship to a legitimate non-punitive government purpose, it was excessive in light of that purpose.

### Count IV: Violation of the Equal Protection Clause of the Fourteenth Amendment
(against all Defendants)

155.   Plaintiffs incorporate the allegations contained in each of the preceding paragraphs as if fully set forth herein.

156.   By punishing Mr. Pratt and Mr. Robinson for refusing to cut their hair, while permitting white people in their custody to have long hair, Defendants intentionally discriminated against Mr. Pratt and Mr. Robinson on the basis of their race, in violation of the Equal Protection Clause of the Fourteenth Amendment.

157.   In enacting, enforcing, and carrying out their policy and practice regarding natural Black hairstyles, Defendants are and have been motivated by an intent to discriminate against Black people, and their policy and practice has led to Black individuals—but not non-Black individuals—being placed in solitary confinement for refusing to cut their hair.

158.    Defendants' policy and practice regarding natural Black hairstyles does not serve a compelling governmental interest.

159.    To the extent that Defendants' policy and practice regarding natural Black hairstyles serves a compelling governmental interest, it is not narrowly tailored to further that interest.

## RELIEF DEMANDED

WHEREFORE, Plaintiffs Leonttay Amir Pratt and Lamont Robinson respectfully request that the Court grant the following relief:

A.     A declaratory judgment that Defendants violated Plaintiffs' rights under RLUIPA, 42 U.S.C. § 2000cc-1, and the First and Fourteenth Amendments of the United States Constitution;

B.     A declaratory judgment that LCCF's grooming policy prohibiting "braids, dreadlocks, cornrows or other similar styles" while allowing other long hair violates the Fourteenth Amendment of the United States Constitution;

C.     An injunction prohibiting Defendants from placing Plaintiffs in the SHU or otherwise punishing them for their refusal to cut off their dreadlocks;

D.     An injunction ordering Defendants to remove the prohibition of "braids, dreadlocks, cornrows or other similar styles" from LCCF's grooming policy;

24

E.     An award of compensatory damages against all Defendants in an amount to be determined by the finder of fact;

F.     An award of punitive damages against the individual Defendants in an amount to be determined by the finder of fact;

G.     Reasonable attorneys' fees and costs; and

H.     Such other relief the Court deems just and proper.

Respectfully submitted,

 /s/ Alexandra Morgan-Kurtz
Alexandra Morgan-Kurtz
Attorney I.D. # PA 312631
PA INSTITUTIONAL LAW PROJECT
100 Fifth Ave, Suite 900
Pittsburgh, Pa 15222
T: 412-434-6175
amorgan-kurtz@pailp.org

 /s/ Matthew A. Feldman
Matthew A. Feldman
Attorney I.D. # PA 326273
PA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
T: 215-925-2966
F: 215-925-5337
mfeldman@pailp.org

DATE: May 20, 2020

25