# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

LEONTTAYY AMIR PRATT and          :
LAMONT ROBINSON,                  :
                                  :
        Plaintiffs,              :          CIVIL ACTION NO. 20-0171
                                  :
        v.                       :          (CONNER, J.)
                                  :
MICHAEL OTT, et al.,              :
                                  :
        Defendants.              :
_____:


## PLAINTIFFS' RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

Matthew A. Feldman                    Alexandra Morgan-Kurtz
Attorney I.D. # PA 326273             Attorney I.D. # PA 312631
PA INSTITUTIONAL LAW PROJECT          PA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S           100 Fifth Ave, Suite 900
Philadelphia, PA 19106                Pittsburgh, Pa 15222
T: 215-925-2966                       T: 412-434-6175
mfeldman@pailp.org                    amorgan-kurtz@pailp.org

*Counsel for Plaintiffs*

DATE: August 24, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………ii

**I. INTRODUCTION**…………………………………………………...……1

**II. STATEMENT OF FACTS**…………………………………….………...…2

**III. LEGAL STANDARD**…………………………………………………...4

**IV. ARGUMENT**…………………………………………………………….5

    **A. Plaintiffs' RLUIPA claim is not moot because they are still entitled to seek damages.**…………………………………5

    **B. Plaintiffs' substantive due process claim is not barred by the more-specific-provision rule.**……………………………10

    **C. Plaintiffs state a race discrimination claim under the Equal Protection Clause.**……………………………………13

        1. Defendants' hair policy facially classifies people on the basis of race.………………………………………16

        2. Defendants applied their hair policy differently on the basis of race.………………………………………23

        3. Defendants' hair policy is motivated by a discriminatory intent and disproportionately affects Black individuals.………………25

**V. CONCLUSION**…………………………………………………………30

CERTIFICATE OF WORD COUNT……………………………………...…32

CERTIFICATE OF SERVICE………………………………………………33

i

## TABLE OF AUTHORITIES

**Cases**

*A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*,
    372 F.3d 572 (3d Cir. 2004)……………………………………….……..24

*Arnold v. Barbers Hill Indep. Sch. Dist.*, No. 4:20-CV-1802,
    2020 U.S. Dist. LEXIS 148137 (S.D. Tex. Aug. 17, 2020)………........23, 28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)………………………..……….…5, 23

*Batson v. Kentucky*, 476 U.S. 79 (1986)…………………………………..30

*Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996)…………………..…24

*Bell v. Wolfish*, 441 U.S. 520 (1979)…………………………………...11

*Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249 (3d Cir. 2010)……………10

*Chavez v. Ill. State Police*, 251 F.3d 612 (7th Cir. 2001)………………….....29

*Citizens Council of Del. Cty. v. Brinegar*,
    741 F.2d 584 (3d Cir. 1984)………………………………………....7

*Civil Liberties for Urban Believers v. City of Chicago*,
    342 F.3d 752 (7th Cir. 2003)………………………………………...8

*Comm. of Va. v. Browner*, 80 F.3d 869 (4th Cir. 1996)……………………7

*Covenant Christian Ministries, Inc. v. City of Marietta*,
    654 F.3d 1231 (11th Cir. 2011)……………….……………………….9

*Davila v. N. Reg'l Joint Police Bd.*,
    979 F. Supp. 2d 612 (W.D. Pa. 2013)……………………….....14, 23

*Davis v. Guam*, 932 F.3d 822 (9th Cir. 2019)……………..……….17, 18, 19, 22

*Dehart v. Horn*, 227 F.3d 47 (3d Cir. 2000) (en banc)………………..…10, 12

*DeMoss v. Crain*, 636 F.3d 145 (5th Cir. 2011)…………………………9

*Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524 (3d Cir. 2011)…………...15, 16, 17

*Donovan v. Punxsutawney Area Sch. Bd.*,
    336 F.3d 211 (3d Cir. 2003)…………………………………………………8

*Duncan v. Walker,* 533 U.S. 167 (2001)…………………………………...…7

*Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991)…………..………18, 22

*Ellis v. Brotherhood of Railway Airline & Steamship Clerks*,
    466 U.S. 435 (1984)………………………………………………………....8

*Family Life Church v. City of Elgin*, No. 07 CV 0217,
    2007 U.S. Dist. LEXIS 70545 (N.D. Ill. Sep. 24, 2007)……………………9

*Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398 (5th Cir. 2015)……………..…29

*Floyd  v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013)…...…………16, 30

*Hassan v. City of New York*, 804 F.3d 277 (3d Cir. 2015)…………………..*passim*

*Hennis v. Tedrow*, Civil Action No. 10-445,
    2011 U.S. Dist. LEXIS 34705 (W.D. Pa. Mar. 31, 2011)…………………12

*Hernandez v. New York*, 500 U.S. 352 (1991)…………………..……….....18, 22

*Hudgins v. Wrights*, 11 Va. 134 (1806)…………………………………….…..20

*Hunter v. Underwood*, 471 U.S. 222 (1985)…………………………………...27

*Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*,
    538 F.2d 164 (7th Cir. 1976) (en banc)…………………………………….20

*Jersey Cent. Power & Light Co. v. New Jersey*,
    772 F.2d 35 (3d Cir. 1985)……………………………………………...…8

*Johnson v. California*, 543 U.S. 499 (2005)…………………………….…13, 22

*Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015)………………………...12

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*,
   510 F.3d 253 (3d Cir. 2007)……………………………………...……….5, 8

*Mauwee v. Donat*, No. 3:06-cv-00122-RCJ-VPC,
   2009 U.S. Dist. LEXIS 86141 (D. Nev. May 28, 2009)……………….…9

*McCleskey v. Kemp*, 481 U.S. 279 (1987)…………………………………...13

*McCrea v. Gheraibeh*, 669 S.E.2d 333 (S.C. 2008)………………………..20, 21

*McTernan v. City of York*, 577 F.3d 521 (3d Cir. 2009)…………………….….4

*McWright v. Alexander*, 982 F.2d 222 (7th Cir. 1992)……………………………17

*Millin v. McClier Corp.*, No. 02 Civ. 6592,
   2005 U.S. Dist. LEXIS 2024 (S.D.N.Y. Feb. 4, 2005)……………………30

*Morrow v. Balaski*, 719 F.3d 160 (3d Cir. 2013) (en banc)………………………..4

*Opulent Life Church v. City of Holly Springs, Miss.*,
   697 F.3d 279 (5th Cir. 2012)……………………………………...…5

*Ozawa v. United States*, 260 U.S. 178 (1922)…………………………………18

*Pac. Shores Props., LLC v. City of Newport Beach*,
   730 F.3d 1142 (9th Cir. 2013)……………………………...………..26, 27

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007)……………………………………………………16–17

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979)…………………………...17

*Petra Presbyterian Church v. Village of Northbrook*,
   409 F. Supp. 2d 1001 (N.D. Ill. 2006)………………………………………9

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008)………………………14

*Phillips v. S.C. Dep't of Corr.*, No. 8:14–CV–02269–BHH–JDA,
   2015 U.S. Dist. LEXIS 105108 (D.S.C. Jul. 1, 2015)……………..………7–8

*Piatnitsky v. Stewart*, No. 3:17–CV–05486–BHS–TLF,
2019 U.S. Dist. LEXIS 88067 (W.D. Wash. Feb. 27, 2019)……………..…7

*Plessy v. Ferguson*, 163 U.S. 537 (1896)……………………………………....18

*Rice v. Cayetano*, 528 U.S. 495 (2000)…………………………………...22

*Rouser v. White*, 630 F. Supp. 2d 1165 (E.D. Cal. 2009)……………………...8

*Shaw v. Reno*, 509 U.S. 630 (1993)………………………………..……….15, 17

*Soldal v. Cook Cty.*, 506 U.S. 56 (1992)……………………………………10

*Startzell v. City of Philadelphia*, 533 F.3d 183 (3d Cir. 2008)……………………14

*Stevenson v. Carroll*, 495 F.3d 62 (3d Cir. 2000)…………………………..…….11

*Tavarez v. Klingensmith*, 372 F.3d 188 (3d Cir. 2004)…………………………..6

*Thomas v. Indep. Twp.*, 463 F.3d 285 (3d Cir. 2006)…………………..……….23

*Turner v. Safley*, 482 U.S. 78 (1987)……………………………..……10–11

*United States v. Lanier*, 520 U.S. 259 (1997)……………………………..10

*United States v. Rabb*, 680 F.2d 294 (3d Cir. 1982)………………………..…7

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)…………………………………………..…..25, 26

*Walker v. Coffey*, 956 F.3d 163 (3d Cir. 2020)………………………..……5, 30

*Washington v. Davis*, 426 U.S. 229 (1976)…………………………………...13, 27

*Waterman v. Farmer*, 183 F.3d 208 (3d Cir. 1999)………………………………12

*Whren v. United States*, 517 U.S. 806 (1996)…………………………………..23

*Williams v. Dart*, 967 F.3d 625, No. 19-2108,
2020 U.S. App. LEXIS 23132 (7th Cir. July 23, 2020)……………26, 27, 29

v

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886)…………………………………………...23

**Statutes and Rules**

42 U.S.C. § 1983…………………………………………………………………...…1

42 U.S.C. § 2000cc-3………………………………………………………….....6, 7, 8, 9

Fed. R. Civ. P. 8…………………………………………………………………...10

Fed. R. Civ. P. 12……………………………………………………………….2, 4, 13

**Other Authorities**

C. Wright, A. Miller and E. Cooper,
    FEDERAL PRACTICE AND PROCEDURE (1975 and Supp. 1983)……..………...8

D. Wendy Greene, *Title VII: What's Hair (and Other
    Race-Based Characteristics) Got to Do with It?*,
    79 U. COLO. L. REV. 1355 (2008)…………………………..............*passim*

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed.)………………….…6

Trina Jones, *Shades of Brown: The Law of Skin Color*,
    49 DUKE L. J. 1487 (2000)…………..……………………….…18, 19

## I.     INTRODUCTION

Plaintiffs Leonttayy Amir Pratt and Lamont Robinson respectfully submit this response in opposition to Defendants' Motion to Dismiss (ECF No. 29). Mr. Pratt and Mr. Robinson, Black Rastafarian men with natural dreadlocks who were incarcerated as pretrial detainees, brought this lawsuit under 42 U.S.C. § 1983 because Defendants, Lebanon County and four high-ranking officials of the Lebanon County Correctional Facility ("LCCF"), placed them in solitary confinement for refusing to cut off their dreadlocks.

Defendants kept Mr. Pratt and Mr. Robinson in solitary confinement for months pursuant to a policy that prohibited incarcerated individuals from having braids, cornrows, or dreadlocks even though other forms of long hair were permitted. Defendants continued to keep Mr. Pratt and Mr. Robinson in solitary confinement despite knowing that cutting off their dreadlocks would violate their sincerely held religious beliefs, despite the fact that white individuals in their custody were permitted to grow their hair long, and despite the fact that their hair regulations bore no rational relationship to any legitimate penological objectives.

Plaintiffs filed this lawsuit for damages and declaratory and injunctive relief[1] to seek redress for the violation of their rights under the Religious Land Use and

_____

[1] As of the date of this filing, neither Mr. Pratt nor Mr. Robinson is incarcerated at LCCF; therefore, Plaintiffs do not presently seek injunctive relief.

1

Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, the Free Exercise Clause of the First Amendment, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Defendants now seek dismissal under Rule 12(b)(6) of Plaintiffs' RLUIPA claim and both Fourteenth Amendment claims. ECF No. 28.  For the reasons explained below, Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

Leonttayy Amir Pratt and Lamont Robinson are Black men whose hair is in long, natural dreadlocks in accordance with their Rastafarian religious beliefs. ECF No. 22, Am. Compl. ¶¶ 4–5, 72–78, 106–15 (hereinafter, "AC"). In addition to having religious significance for some individuals, dreadlocks are commonly associated with Black people and a natural way for many Black people to grow their hair long. *Id.* ¶¶ 12–13. Indeed, for many Black people, dreadlocks form naturally, without any manipulation, when they grow their hair long. *Id.* ¶ 13.

While incarcerated at LCCF as pretrial detainees, Mr. Pratt and Mr. Robinson spent months in solitary confinement solely because they refused to violate their religious beliefs and cut off their hair, despite the fact that people with other hair textures, white individuals in particular, were permitted to wear their hair long without facing any adverse consequences. *Id.* ¶¶ 4–5, 24, 81–82, 128–29, 156. Mr. Pratt and Mr. Robinson were placed in solitary confinement pursuant to a written policy that explicitly prohibited braids and cornrows, two hairstyles that are

frequently worn by Black people, and was interpreted by LCCF officials to prohibit dreadlocks, but permitted other forms of long hair. *Id.* ¶¶ 23–29.

The individual Defendants—the LCCF Warden, two Deputy Wardens, and the Captain of Security—all had a hand in formulating, enforcing, and/or defending LCCF's hair policy. *Id.* ¶¶ 6–9, 27–28, 32–33, 39–42, 86–90, 123–26, 133, 136. Defendant Robert Karnes, the Warden, cited the need "to ensure cleanliness in the correctional facility" and concerns about incarcerated individuals' hiding contraband as the justifications for LCCF's hair policy, despite the facts that dreadlocks do not present any unique cleanliness concerns, there have not been incidents of LCCF prisoners hiding contraband in dreadlocks, and numerous other jails and prisons permit people in their custody to have dreadlocks. *Id.* ¶¶ 33–37, 93–94.

Defendant Joseph Wheeler, the Captain of Security, led one or more enforcement operations during which he and other LCCF officers entered housing units in the jail and forced all the non-white men—and none of the white men—to remove their hats so that staff could check to see whether they had prohibited hairstyles. *Id.* ¶¶ 39–42. It was one of these inspections, on or around February 15, 2020, that led to Mr. Robinson's placement in solitary confinement. *Id.* ¶¶ 123–28. Prior to that, Mr. Robinson had managed to remain in general population by concealing his dreadlocks, which caused him great anxiety. *Id.* ¶¶ 117–22. Mr. Pratt,

3

on the other hand, was placed in solitary confinement the day after he arrived at the jail, on November 22, 2019. *Id.* ¶¶ 80–81.

Finally, on April 23, 2020, Defendant Karnes announced that LCCF's hair policy had been revised and that a religious exemption had been added. *Id.* ¶¶ 43–48; Defs.' Ex. A, ECF No. 28-1. Like the prior policy, the new policy singles out and prohibits natural Black hairstyles but permits other forms of long hair. AC ¶¶ 44–46; Defs.' Ex. A.  Unlike the prior policy, the new policy explicitly prohibits dreadlocks, and states that dreadlocks, braids, and cornrows "present security or hygiene concerns." AC ¶ 45; Defs.' Ex. A. As a result of this new policy and their sincerely held religious beliefs, Mr. Pratt and Mr. Robinson were transferred to general population without having to cut off their dreadlocks. AC ¶¶ 105, 142.

## III.   LEGAL STANDARD

In ruling on a motion to dismiss under Rule 12(b)(6), a court must accept all well-pleaded allegations of the complaint as true, view them in the light most favorable to the plaintiff, and draw all inferences in the plaintiff's favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc); *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009). The motion must be denied unless "a court finds that plaintiff's claim[ ] lack[s] facial plausibility." *Morrow*, 719 F.3d at 165. A complaint need not contain "detailed factual allegations" but merely "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). If the complaint includes "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of [the] cause of action," the plausibility requirement is met, and the motion to dismiss must be denied. *Walker v. Coffey*, 956 F.3d 163, 166 (3d Cir. 2020) (alterations, quotation marks, and citation omitted).

## IV.  ARGUMENT

### A. Plaintiffs' RLUIPA claim is not moot because they are still entitled to seek damages.

Defendants' addition of a religious exemption to LCCF's hair policy does not prevent Plaintiffs from recovering damages under RLUIPA for the harm they suffered as a result of LCCF's prior policy.[2] LCCF's change in policy cannot erase the harm they suffered, and they are entitled to compensatory damages under RLUIPA for that harm. *See Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 273 (3d Cir. 2007) (stating that "monetary relief is available to [plaintiff]" under RLUIPA and remanding plaintiff's RLUIPA claim to the district court to "determine compensatory damages"); *see also Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 290 (5th Cir. 2012) ("[M]oney damages are available under RLUIPA against political subdivisions of states, such as municipalities and counties.").

---

[2] Since Plaintiffs are not presently seeking injunctive relief, they do not address Defendants' arguments relating to voluntary cessation here.

5

Defendants contend that RLUIPA's safe-harbor clause relieves them of all liability for their past violations of RLUIPA. This argument plainly misinterprets the statutory language. RLUIPA's safe-harbor clause provides:

> A government may avoid *the preemptive force* of any provision of this Act by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden.

42 U.S.C. § 2000cc-3(e) (emphasis added). By its plain language, the safe-harbor clause only applies to RLUIPA's "preemptive force," i.e., to the availability of prospective relief under RLUIPA. *See id.*; *see also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed.) (defining "preemptive" as "having the power to preempt" and defining "preempt" as "to prevent from happening or taking place"). Since compensatory damages are a remedy for past harm, rather than a means of preventing future harm, the safe-harbor clause does not bar Plaintiffs from continuing to seek damages.

Interpreting the safe-harbor clause to bar requests for monetary relief for past harm would also contravene a fundamental cannon of statutory interpretation, the rule against surplusage. *See Tavarez v. Klingensmith*, 372 F.3d 188, 190 (3d Cir. 2004) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) ("If possible, we must give effect … to every clause and word of a statute and be reluctant to treat statutory

6

terms as surplusage.") (quotation marks omitted); *Comm. of Va. v. Browner*, 80 F.3d 869, 877 (4th Cir. 1996) ("A court should not—and we will not—construe a statute in a manner that reduces some of its terms to mere surplusage."). The Court must give meaning to each part of the statute, not ignore the clear limitation of Section 2000cc-3(e) to the "preemptive force" of RLUIPA. That the meaning suggested by Defendants "is a possible one does not mean that it is the one that Congress intended." *Citizens Council of Del. Cty. v. Brinegar*, 741 F.2d 584, 591 (3d Cir. 1984). If that was the meaning intended by Congress, there are a myriad of plainer ways it could have been written, including by simply removing the clause "the preemptive force of" so the statute stated that "a government may avoid any provision of this Act…." *See United States v. Rabb*, 680 F.2d 294, 296 (3d Cir.), *cert. denied*, 459 U.S. 873 (1982) ("To discern Congress's intent … we begin with the language of the statute itself because we presume that the words Congress has chosen best reflect the legislative purpose."). The inclusion of the phrase "the preemptive force of" must therefore be given weight, and Defendants' interpretation that the safe-harbor clause bars all claims of relief under RLUIPA cannot stand.

Moreover, courts to consider RLUIPA's safe-harbor provision have interpreted it "as a statutory mootness provision." *Piatnitsky v. Stewart*, No. 3:17–CV–05486–BHS–TLF, 2019 U.S. Dist. LEXIS 88067, at *24, n.2 (W.D. Wash. Feb. 27, 2019). *See, e.g.*, *Phillips v. S.C. Dep't of Corr.*, No. 8:14–CV–02269–BHH–

JDA, 2015 U.S. Dist. LEXIS 105108, at *12 (D.S.C. Jul. 1, 2015), *recommendation adopted*, 2015 U.S. Dist. LEXIS 104409 (D.S.C. Aug. 10, 2015) (stating that "courts have interpreted [the safe-harbor provision] under a mootness analysis" and listing cases); *Rouser v. White*, 630 F. Supp. 2d 1165, 1183 (E.D. Cal. 2009) (stating that "[t]he only Court of Appeals that appears to have addressed this provision has interpreted it under a mootness analysis" and that "[t]his appears consistent with the plain language of § 2000cc-3(e)") (citing *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762 (7th Cir. 2003), *cert. denied*, 541 U.S. 1096 (2004)).

It is well settled that the doctrine of mootness does not apply to monetary damages. *Jersey Cent. Power & Light Co. v. New Jersey*, 772 F.2d 35, 41 (3d Cir. 1985) ("[T]he availability of damages or other monetary relief almost always avoids mootness.") (citing *Ellis v. Brotherhood of Railway Airline & Steamship Clerks*, 466 U.S. 435 (1984)). Claims for damages should be considered on the merits, not denied on the grounds of mootness. *Jersey Cent. Power & Light Co.*, 772 F.2d at 41 (citing 13A C. Wright, A. Miller and E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3533.3 (1975 and Supp. 1983) 262). Further, the Third Circuit has explicitly recognized that even when a Plaintiff's claims for injunctive relief under RLUIPA are mooted, their claims for compensatory damages and attorney fees are not. *Lighthouse*, 510 F.3d at 260–61 (citing *Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 218 (3d Cir. 2003)).

Thus, the safe-harbor provision of RLUIPA cannot "stand for the proposition that the corrective action can retroactively erase injuries already incurred as well as the corresponding ability to sue for damages." *Family Life Church v. City of Elgin*, No. 07 CV 0217, 2007 U.S. Dist. LEXIS 70545, at *17 (N.D. Ill. Sep. 24, 2007). Instead, even when 42 U.S.C. § 2000cc-3(e) bars injunctive claims, the "'plaintiff may nevertheless be entitled to recover damages suffered during the time' defendants allegedly burdened his religious practice." *Mauwee v. Donat*, No. 3:06-cv-00122-RCJ-VPC, 2009 U.S. Dist. LEXIS 86141, at *22 (D. Nev. May 28, 2009) (*quoting Petra Presbyterian Church v. Village of Northbrook,* 409 F. Supp. 2d 1001, 1005 (N.D. Ill. 2006)). *See also Covenant Christian Ministries, Inc. v. City of Marietta*, 654 F.3d 1231, 1244 (11th Cir. 2011) (concluding that "[a]lthough a case will normally become moot when a subsequent [ordinance] brings the existing controversy to an end, when the plaintiff has requested damages, those claims are not moot," and addressing the merits of RLUIPA damages claims) (quotations and citations omitted); *DeMoss v. Crain*, 636 F.3d 145, 151 (5th Cir. 2011) (observing that a monetary damages claim was not mooted by changes to a policy that violated RLUIPA).

Therefore, Plaintiffs' requests for damages are not barred by the safe-harbor provision and this Court should deny Defendants' motion to dismiss Plaintiffs' RLUIPA claims.

### B. Plaintiffs' substantive due process claim is not barred by the more-specific-provision rule.

Plaintiffs' Fourteenth Amendment substantive due process claim should proceed to discovery because it is not barred by the more-specific-provision rule. The more-specific-provision rule does not bar a substantive due process claim unless it is "covered" by a more specific constitutional provision, in which case the claim "must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010) (citing *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)). It is axiomatic that a plaintiff may assert multiple legal claims based on the same events, and the more-specific-provision rule does not supplant this well-established rule. *See* Fed. R. Civ. P. 8(d); *see also Soldal v. Cook Cty.*, 506 U.S. 56, 70 (1992) ("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands.") (citation omitted).

Plaintiffs' Fourteenth Amendment claim is not "covered" by their First Amendment claim because the two claims are based on distinct legal theories and have different factual bases. The gravamen of Plaintiffs' First Amendment claim is that the Defendants inhibited their right to free exercise of religion for no legitimate penological purpose by forcing them to either remain in solitary confinement or violate their religious beliefs by cutting off their dreadlocks. *See Dehart v. Horn*, 227 F.3d 47, 51–52 (3d Cir. 2000) (en banc) (citing *Turner v. Safley*, 482 U.S. 78,

10

89 (1987)). The gravamen of Plaintiffs' substantive due process claim, on the other hand, is that as pretrial detainees, they had a right to be free from punishment. *See Stevenson v. Carroll*, 495 F.3d 62, 67 (3d Cir. 2000) (citing *Bell v. Wolfish*, 441 U.S. 520, 535–36 (1979)).

Crucially, Plaintiffs' substantive due process claim is not based on the association between their dreadlocks and their religious beliefs. Indeed, any pretrial detainee placed in solitary confinement indefinitely for an arbitrary reason like the fact that they have dreadlocks—regardless of their religious beliefs or lack thereof—would have a claim under the Fourteenth Amendment. *See Bell*, 441 U.S. at 539 (holding that subjecting pretrial detainees to "arbitrary or purposeless" restrictions or conditions violates their Fourteenth Amendment due process right to be free from punishment). There is no constitutional provision other than the Fourteenth Amendment's Due Process Clause applicable to such a claim.

Although there is overlap between the elements of Plaintiffs' First Amendment and Fourteenth Amendment due process claims, the claims are not identical. To prevail on their substantive due process claim, Plaintiffs will need to establish that Defendants had an "express intent to punish" them or that their placement of them in solitary confinement was either "not rationally related to a legitimate non-punitive government purpose" or "excessive in light of that purpose." *Stevenson*, 495 F.3d at 68. For Plaintiffs' First Amendment claim, the Court will

have to evaluate the "overall reasonableness" of their placement in solitary confinement by considering (1) whether there is a "valid rational connection between [Defendants' policy] and the legitimate governmental interest put forward to justify it"; (2) whether Plaintiffs retained "alternative means" of exercising their right to freely exercise their religion; (3) the "costs" that allowing Plaintiffs in general population without cutting their hair "would [have] impose[d] on other inmates, guards, and prison resources generally"; and (4) "whether there [we]re alternatives to [Defendants' policy] that fully accommodate[d] [Plaintiffs'] rights at de minimis cost to valid penological interests." *See DeHart*, 227 F.3d at 51 (quoting *Waterman v. Farmer*, 183 F.3d 208, 213 (3d Cir. 1999)).

Moreover, the two claims have different factual predicates. For the First Amendment claim, the crucial predicate fact is that Plaintiffs' dreadlocks are an expression of their sincerely-held religious beliefs. For the due process claim, on the other hand, the crucial fact is merely that they were pretrial detainees.[3]

Because Plaintiffs' substantive due process and First Amendment claims have different factual bases and must be evaluated under different legal standards, their

---

[3] The case on which Defendants rely is easily distinguishable. *See* Defs.' Br. 13–14, ECF No. 29 (citing *Hennis v. Tedrow*, Civil Action No. 10-445, 2011 U.S. Dist. LEXIS 34705 (W.D. Pa. Mar. 31, 2011)). The plaintiff in *Hennis* was a convicted prisoner, not a pretrial detainee, and, thus, did not have a Fourteenth Amendment right to be free from punishment. *See id.* at *2; *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015) ("[P]retrial detainees (unlike convicted prisoners) cannot be punished at all[.]").

due process claim is not barred by the more-specific-provision rule. Plaintiffs' Fourteenth Amendment due process claim should, therefore, be permitted to proceed to discovery.

### C. Plaintiffs state a race discrimination claim under the Equal Protection Clause.

The Amended Complaint plausibly alleges that, in formulating and enforcing their prohibition against dreadlocks, Defendants discriminated against Mr. Pratt and Mr. Robinson on the basis of their race, in violation of the Equal Protection Clause. "[P]revention of official conduct discriminating on the basis of race" is the "central purpose" of the Equal Protection Clause. *Washington v. Davis*, 426 U.S. 229, 239 (1976). Recognizing the shameful history of racism in the American criminal legal system—as well as the progress that has been made—the Supreme Court has noted the continued need for "unceasing efforts to eradicate racial prejudice from our criminal justice system." *Johnson v. California*, 543 U.S. 499, 512 (2005) (quoting *McCleskey v. Kemp*, 481 U.S. 279, 309 (1987)). This need is especially striking "[i]n the prison context, when the government's power is at its apex." *Johnson*, 543 U.S. at 511. Race discrimination by the government in prisons and jails is, therefore, subject to strict judicial scrutiny. *Id.* at 509.[4]

---

[4] In ruling on a motion to dismiss under Rule 12(b)(6), the Court need not consider whether Defendants' policy would actually survive strict scrutiny, i.e., whether it is narrowly tailored to further a compelling government interest. *See Hassan v. City of New York*, 804 F.3d 277, 307 (3d Cir. 2015) ("[B]ecause Plaintiffs have plausibly

To state a claim under the Equal Protection Clause, plaintiffs must allege that they were treated differently from others who were similarly situated and that the unequal treatment was the result of intentional discrimination. *Hassan v. City of New York*, 804 F.3d 277, 298 (3d Cir. 2015). To be "similarly situated" merely means to be "alike in all relevant aspects." *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008). Plaintiffs have plainly alleged that they were treated differently from other, non-Black individuals with long hair who were incarcerated at LCCF. Non-Black individuals in LCCF who let their hair grow long are not subject to punishment, so long as they keep their hair tied back or secured, while Black individuals, like Mr. Pratt and Mr. Robinson, are placed in solitary confinement for having long, natural hair. *See, e.g.*, AC ¶¶ 24, 46, 156–57.[5]

Courts have recognized three ways to demonstrate intentional discrimination, and the Amended Complaint states an equal protection claim under each theory.

---

alleged that the City engaged in intentional discrimination against a protected class, and because that classification creates a presumption of unconstitutionality that remains the City's obligation to rebut, Plaintiffs have stated a claim under the Equal Protection Clause of the Fourteenth Amendment.")

[5] While equal protection plaintiffs are required to allege differential treatment, they are "not required to identify specific instances where others have been treated differently, particularly where … [they] plead[ ] additional facts supportive of the plausible conclusion that there is a custom, practice or policy of differential treatment in operation." *Davila v. N. Reg'l Joint Police Bd.*, 979 F. Supp. 2d 612, 630 (W.D. Pa. 2013) (citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 244–45 (3d Cir. 2008)).

> Intentional discrimination can be shown when: (1) a law or policy explicitly classifies citizens on the basis of race …; (2) a facially neutral law or policy is applied differently on the basis of race …; or (3) a facially neutral law or policy that is applied evenhandedly is motivated by discriminatory intent and has a racially discriminatory impact.

*Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 543 (3d Cir. 2011) (citations omitted). Defendants' hair policies explicitly classify people on the basis of race because their singling out of braids, cornrows, and dreadlocks is "unexplainable on grounds other than race," *see Shaw v. Reno*, 509 U.S. 630, 643 (1993) (citation omitted), and is consistent with centuries-old practices of viewing hair texture as a marker of race.[6] Even if the hair policies are viewed as "facially neutral," Plaintiffs still state an Equal Protection claim. They plausibly allege that the regulations were "applied differently on the basis of race," *see Doe*, 665 F.3d at 543, in that Defendants enforced them by inspecting the hair of non-white individuals incarcerated at LCCF but not white individuals. *See* AC ¶¶ 39–42, 123–24. Finally, the Amended Complaint contains ample facts to raise the plausible inference that

---

[6] That the old hair policy did not include the word "dreadlocks" is of no moment, as Plaintiffs plausibly allege that Defendants considered the policy to prohibit dreadlocks, as well as braids and cornrows. *See, e.g.*, AC ¶¶ 23–29; *see also Hassan*, 804 F.3d at 295 n.5 ("[T]he primary—indeed, perhaps only—difference [between a suit involving a written and unwritten policy] is an evidentiary one.") (bracketing in original; citation omitted).

Defendants' policy is motivated by an intent to discriminate against Black people imprisoned at LCCF and disproportionately affects Black individuals.

Although Plaintiffs need to allege discriminatory ***intent***, they need not allege, or ultimately establish, that Defendants were motivated by a desire to ***harm*** Black people. *See Hassan*, 804 F.3d at 298 (explaining that "intentional discrimination need not be motivated by ill will, enmity, or hostility to contravene the Equal Protection Clause" and distinguishing "between an intent to treat two groups differently and an intent to harm") (quotation marks and citations omitted). Whether viewed as an explicit racial classification or as facially neutral, Defendants' policy need not have been motivated by animus toward Black people to violate the Equal Protection Clause. *See Floyd v. City of New York*, 959 F. Supp. 2d 540, 662 (S.D.N.Y. 2013) ("[T]o establish an equal protection violation based on an intentionally discriminatory application of a facially neutral policy … Plaintiffs are not required to prove that … the discrimination [was] based on ill will, enmity, or hostility.") (quotation marks and citation omitted).

1. <u>Defendants' hair policy facially classifies people on the basis of race.</u>

Defendants' hair policy facially classifies people on the basis of race by singling out natural Black hairstyles and using hair texture as a proxy for race. "A racial classification occurs … when an action 'distributes burdens or benefits on the basis of' race." *Doe*, 665 F.3d at 547 (quoting *Parents Involved in Cmty. Sch. v.*

16

*Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007)). "Where a plaintiff can point to a facially discriminatory policy … direct evidence of intent is supplied by the policy itself" and no further showing of discriminatory intent is required. *Hassan*, 804 F.3d at 295 (citations and quotation marks omitted).

Courts are not limited to the bare text of a challenged measure in determining whether it contains a suspect classification. Some policies, "although race neutral, are, on their face, 'unexplainable on grounds other than race.'" *Shaw*, 509 U.S. at 643; *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979) (acknowledging the possibility of "covert" classifications and distinguishing them from truly facially neutral ones). This sort of discrimination, referred to by some courts as "proxy discrimination," is "a form of facial discrimination." *Davis v. Guam*, 932 F.3d 822, 837 (9th Cir. 2019) (citations omitted). Proxy discrimination "arises when the defendant enacts a law or policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Id.*[7]

---

[7] An instructive example from another context is "using gray hair as a proxy for age: there are young people with gray hair (a few), but the 'fit' between age and gray hair is sufficiently close that they would form the same basis for invidious classification." *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992).

17

Courts have long acknowledged the seemingly obvious proposition that discrimination on the basis of skin color is a form of facial race discrimination. *See, e.g.*, *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 631 (1991) (stating that skin color is not a permissible consideration in jury selection); *Hernandez v. New York*, 500 U.S. 352, 371 (1991) ("[S]kin color[ ] should be treated as a surrogate for race under an equal protection analysis."). Yet it is equally obvious that skin color is neither synonymous with race nor a perfect proxy for race. *See* Trina Jones, *Shades of Brown: The Law of Skin Color*, 49 DUKE L. J. 1487, 1493 (2000) ("Race and skin color are distinct phenomena that sometimes overlap."). Some people categorized racially as "Black" have lighter skin than other people categorized racially as "white."[8] But it is difficult to imagine any court denying that a government policy that classified and treated individuals differently on the basis of skin complexion triggered strict scrutiny under the Equal Protection Clause. Likewise, courts have also long recognized that skin color is not the ***only*** marker of race. *See, e.g.*, *Ozawa v. United States*, 260 U.S. 178, 189, 197 (1922) (collecting cases, and holding that a Japanese man was not a "white person" and was, thus, ineligible for naturalization, his skin complexion notwithstanding, because "the test afforded by the mere color

---

[8] *See id.* at 1496 n.26 (noting that Homer Plessy "appeared White" but, due to his ancestry, was nonetheless "deemed a member of the colored race by the laws of Louisiana" and the United States Supreme Court) (citing *Plessy v. Ferguson*, 163 U.S. 537, 541, 552 (1896)).

of the skin of each individual is impracticable as that differs greatly among persons of the same race").

To identify racial classifications, a more nuanced understanding of race is required. "Race includes physical appearances and behaviors that society, historically and presently, commonly associates with a particular racial group, even when the physical appearances and behaviors are not 'uniquely' or 'exclusively' 'performed' by, or attributed to a particular racial group." D. Wendy Greene, *Title VII: What's Hair (and Other Race-Based Characteristics) Got to Do with It?*, 79 U. COLO. L. REV. 1355, 1385 (2008); *see also Davis*, 932 F.3d at 835 & n.10 (citing Professor Greene's definition approvingly and explaining that "as a legal concept, a racial category is generally understood as a group, designated by itself or others, as socially distinct based on perceived common physical, ethnic, or cultural characteristics"). There are, thus, many different characteristics that can serve as markers of—or proxies for—race.

Hair texture has long served as a marker of race in the United States. *See, e.g.*, Greene, *supra*, at 1365 (quoting a 1797 text listing "crisp or wooly hair" as one of several markers of the "'negro' race"); Jones, *supra*, at 1494 (listing "the curl of the hair" as one of several physical traits that "have and continue to be used to delineate racial categories and to assign persons to racial groups"). In 1806, the Virginia Supreme Court opined that a "woolly head of hair" was "so strong an ingredient in

19

the African constitution" that, skin complexion notwithstanding, it marked a person as of African ancestry and presumptively enslaveable. *Hudgins v. Wrights*, 11 Va. 134, 139–40 (1806). Accordingly, modern courts have continued to recognize that discrimination on the basis of hair texture or style can be a form of facial race discrimination. *See, e.g.*, *McCrea v. Gheraibeh*, 669 S.E.2d 333, 335 (S.C. 2008); *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 168 (7th Cir. 1976) (en banc).

In *Jenkins*, the Seventh Circuit held that an employee who complained in an EEOC charge that her supervisor denied her a promotion because she "could never represent Blue Cross with [an] Afro," had adequately made an accusation of race discrimination: "A laypersons [*sic*] description of racial discrimination could hardly be more explicit." *Id.* The Court explained that "[t]he reference to the Afro hairstyle was merely the method by which the plaintiff's supervisor allegedly expressed the employer's racial discrimination." *Id.*

The same goes for dreadlocks. *See* Greene, *supra*, at 1385 ("[J]ust as an Afro connotes Blackness within the lay community, and an employer's negative reference to an Afro alone can provide a sufficient basis for a race discrimination claim, corn rows, dreadlocks, [or] braids, … are equally indicative of Blackness[.]") In *McCrea*, the South Carolina Supreme Court considered and rejected the proposition that striking a potential juror on account of his dreadlocks was a "race-neutral" strike

under the Equal Protection Clause. *McCrea*, 669 S.E. 2d at 335. Explaining that "dreadlocks retain their roots as a religious and social symbol of historically black cultures" the Court held that a lawyer's explanation that he struck a potential juror "based simply on counsel's 'uneasiness' over the juror's dreadlocks was not a race-neutral reason for exercising a peremptory strike." *Id.* Striking a juror on account of his dreadlocks, the Court explained, "carries with it an inherently discriminatory intent." *Id.* at 335 n.2.

Like the peremptory strike in *McCrea* and the supervisor's hair-based promotion decision in *Jenkins*, Defendants' prohibition against dreadlocks is "inherently discriminatory." *See id.* Defendants' policies single out hairstyles commonly worn by Black people, with strong, cultural and historical associations with Blackness, and they punish people who wear their hair in these ways. *See* Greene, *supra*, at 1385 ("Historically and contemporarily, dreadlocks and corn rows have been associated with 'Blackness.'"). Moreover, with respect to dreadlocks, Defendants' policy specifically singles out Black individuals who let their hair grow long and allow it to remain in its natural state. *See* AC ¶¶ 12–14. Defendants have no such prohibition against long hair worn in its natural state by white individuals and others with hair textures not viewed as markers of Blackness. *See id.* ¶¶ 24, 46, 156.

That there could be white or other non-Black individuals in Defendants' custody with hairstyles prohibited by their policy does not mean the policy does not facially discriminate against Black people. "[P]roxy discrimination does not require an exact match between the proxy category and the racial classification for which it is a proxy." *Davis*, 932 F.3d at 838. Just as a strictly color-based classification would trigger strict scrutiny despite color being an imperfect proxy for race, *see Edmonson*, 500 U.S. at 631 (1991); *Hernandez*, 500 U.S. at 371, Defendants' hair texture-based classification requires the same "searching judicial review." *See Johnson*, 543 U.S. at 511. Likewise, the facts that not all Black individuals in Defendants' custody have prohibited hairstyles and not all Black individuals' hair naturally forms dreadlocks when grown long do not militate against a finding that Defendants' policy contains a facial classification based on race. "Simply because a class … does not include all members of the race does not suffice to make the classification race neutral." *Rice v. Cayetano*, 528 U.S. 495, 516–17 (2000).

Because Defendants' hair policy facially classifies people on the basis of race, Plaintiffs have stated a valid claim for intentional discrimination in violation of the Equal Protection Clause. "[D]irect evidence of intent is supplied by the policy itself" *see Hassan*, 804 F.3d at 295, and no further showing of intent is required.

2. Defendants applied their hair policy differently on the basis of race.

Even if the Court chooses to view Defendants' hair policy as facially neutral, the Amended Complaint still states an equal protection claim because Plaintiffs make detailed allegations that Defendants focused their efforts to enforce their policy on non-white individuals. "The Equal Protection Clause 'prohibits selective enforcement of the law based on considerations such as race.'" *Thomas v. Indep. Twp.*, 463 F.3d 285, 297 (3d Cir. 2006) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886).

To prevail at this stage, Plaintiffs need only have pleaded that Defendants applied the hair policy to them "with a greater degree of severity than [people of] other [races]." *Hassan*, 804 F.3d at 294 (quotation marks and citation omitted). So long as the allegations of unequal treatment are factual rather than merely conclusory, *see Iqbal*, 556 U.S. at 678–79, the motion to dismiss must be denied. *See, e.g.*, *Davila*, 979 F. Supp. 2d at 630–31 (denying motion to dismiss plaintiff's equal protection claim because the plaintiff alleged that the defendant police department contacted immigration authorities regarding Hispanic drivers it stopped, but not non-Hispanic drivers); *see also Arnold v. Barbers Hill Indep. Sch. Dist.*, No. 4:20-CV-1802, 2020 U.S. Dist. LEXIS 148137, at *33–34, 40 (S.D. Tex. Aug. 17, 2020) (finding a substantial likelihood of success on plaintiff's equal protection claim and granting a preliminary injunction, where a school district's race-neutral

hair policy prohibiting boys from having long hair was selectively enforced against Black students with dreadlocks).

The Amended Complaint clearly alleges Defendants selectively enforced their hair policy on the basis of race. LCCF staff, including Defendant Wheeler, entered one or more housing units with the express purpose of looking for people who had prohibited hairstyles, and they required all the non-white individuals—but none of the white individuals— to remove their hats and shake out their hair. AC ¶¶ 39–41, 123-24. Without having checked any of the white individuals' hair, they then told every non-white individual who was found to have braids or dreadlocks that they had to cut them off by the next day or they would be put in solitary confinement. *Id.* ¶¶ 42, 125–126.[9]

---

[9] Mr. Robinson was placed in solitary confinement as a result of the discriminatory inspection described here. *Id.* ¶¶ 123–28. Mr. Pratt, however, had already been in solitary confinement on account of his hair for nearly three months at the time of the inspection on Mr. Robinson's unit. *Id.* ¶¶ 81–82. Nonetheless, especially given the involvement of a high-ranking official like Defendant Wheeler, the jail's Captain of Security, *id.* ¶ 9, the Amended Complaint raises the plausible inference that Defendants had a custom and practice of selectively enforcing their hair policy against Black individuals and that Mr. Pratt was a victim of this selective enforcement as well. Likewise, the Amended Complaint plausibly alleges the liability of the other individual Defendants (all high-ranking officials at the jail involved in the enforcement of the hair policy) and Lebanon County for this selective enforcement. *See A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (discussing supervisory liability); *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (discussing municipal liability).

Defendants cannot have it both ways. They insist the prohibited hairstyles have nothing to do with race and can be worn by people of all races, *see* Defs.' Br. 15–16, yet in enforcing the policy they did not even bother to check whether white individuals had them. This is either a tacit concession that the policy is not actually "race-neutral," as Defendants now assert, *see id.* at 16, or it is evidence of intentionally discriminatory enforcement. Either way, Plaintiffs have stated an equal protection claim.

3. Defendants' hair policy is motivated by a discriminatory intent and disproportionately affects Black individuals.

The Amended Complaint also states an equal protection claim because— again, even if Defendants' hair policy is viewed as facially neutral, which it is not, *see supra* § IV.C.1—Plaintiffs adequately allege that the policy is motivated by an intent to discriminate against Black individuals and that it disproportionately affects Black individuals. A plaintiff states a valid equal protection claim if he "identif[ies] a facially neutral policy that the [Defendants] purposefully designed to impose different burdens on [members of a protected class] and that … does in fact have the intended adverse effect." *Hassan*, 804 F.3d at 294–95 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977)) (quotation marks and additional citation omitted).

Plaintiffs adequately pleaded that Defendants' hair policy disproportionately affects Black individuals at LCCF when they alleged that the policy "has led to Black

individuals—but not non-Black individuals—being placed in solitary confinement for refusing to cut their hair." AC ¶ 157; *see also Arlington Heights*, 429 U.S. at 264–65; *Williams v. Dart*, 967 F.3d 625, No. 19-2108, 2020 U.S. App. LEXIS 23132, at *22 (7th Cir. July 23, 2020) (denying motion to dismiss where plaintiffs alleged 80% of the people affected by the challenged policy were Black). Moreover, Plaintiffs' allegations of selective enforcement, *see supra* § IV.C.2, are themselves allegations of a discriminatory impact on Black individuals.

As for discriminatory intent, a plaintiff need not "prove that the challenged action rested solely on racially discriminatory purposes … or even that a [discriminatory] purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265. Rather, the plaintiff need only show "that a discriminatory purpose [was] a motivating factor in the decision." *Id.* at 265–66.

Determining whether a discriminatory purpose was a motivating factor "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. Given the fact-dependent nature of this inquiry, it is the rare well-pleaded equal protection claim that can be resolved in a defendant's favor as a matter of law, especially at the pleading stage. *See Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013) ("[T]he plaintiff need provide very little [ ] evidence [of discriminatory intent] to raise a genuine issue of fact."). Indeed, "***any*** indication of discriminatory motive may suffice to raise a

question that can only be resolved by a fact-finder." *Id.* (emphasis added). If a plaintiff's allegations of purposeful race discrimination are "suspicious at first glance," the claim should proceed to discovery. *Williams*, 2020 U.S. App. LEXIS 23132, at *23.

The requisite "discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact … that the law bears more heavily on one race than another." *Washington*, 426 U.S. at 242. "It is also not infrequently true that the discriminatory impact … may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." *Id.*

The Amended Complaint is replete with well-pleaded factual allegations that raise the plausible inference that Defendants had a discriminatory purpose in enacting and enforcing their hair policy. First, the allegation that Black, and only Black, individuals have been placed in solitary confinement as a result of the policy raises the inference that Defendants formulated and maintained the policy with a discriminatory purpose.[10] Second, Defendants' selective enforcement of the policy

---

[10] Even if white individuals had been placed in solitary confinement as a result of Defendants' hair policy, it would not preclude a finding that Defendants' purpose was to discriminate against Black individuals. *See  Hunter v. Underwood*, 471 U.S. 222, 231–32 (1985) (striking down state constitutional provision that disenfranchised people convicted of certain crimes because it was enacted for the purpose of disenfranchising Black voters, even though it also disenfranchised some white voters); *Pac. Shores Props.*, 730 F.3d at 1160 ("Discriminatory laws, policies,

27

against non-white individuals, *see supra* § IV.C.2, is itself evidence that they intended the policy to discriminate against Black individuals—especially since Defendant Wheeler, who as Captain of Security reviews LCCF's policies and procedures, participated in the racially discriminatory inspection. *See* AC ¶¶ 9, 39–40, 123; *see also Arnold*, 2020 U.S. Dist. LEXIS 148137, at *28–29 (finding that school administrators' singling out plaintiffs for scrutiny because of their dreadlocks in the enforcement of their prohibition against long hair was evidence the policy was enacted with a discriminatory motive).

Third, the very fact that the policy singles out hairstyles commonly and historically associated with Black people and appropriate for hair textures racially coded as Black raises the strong inference that Defendants intended to discriminate against Black individuals. *See supra* § IV.C.1. Given that "[h]istorically and contemporarily, dreadlocks and corn rows have been associated with 'Blackness,'" *see* Greene, *supra*, at 1385, and that dreadlocks are a natural way for many Black people to keep their hair long, *see* AC ¶¶ 12–14, it is certainly plausible that Defendants intended to single out Black people for differential treatment when they formulated their hair policy. Even if Defendants' hair policy is viewed as "facially neutral," it nonetheless "raises an inference of impermissible intent [because it]

---

or actions will often have negative effects (whether intended or not) on individuals who do not belong to the disfavored group[, but] [t]his does not [ ] change the fact that such laws, policies, or actions are discriminatory[.]")

map[s] so closely onto racial divisions that [it] allow[s] racial targeting 'with almost surgical precision.'" *See Williams*, 2020 U.S. App. LEXIS 23132, at *22–23 (citation and quotation marks omitted) (denying motion to dismiss where plaintiffs alleged the defendant used neighborhood and arrest history to determine who could be released on bail because both were "plausible prox[ies] for race").

Finally, the justifications Defendants have offered for their hair policy are themselves evidence of discriminatory intent. Defendants claim their hair policy is justified by the need "to ensure cleanliness in the correctional facility," *see* AC ¶ 33, and that "braids, dreadlocks, [and] cornrows [ ] present … hygiene concerns." Defs.' Ex. A. Defendants' false belief that dreadlocks and other natural Black hairstyles present hygiene or cleanliness concerns is rooted in age-old racist stereotypes. *See* Greene, *supra*, at 1387 ("Because of the negative terms used to refer to 'Black' hair, such as 'nappy,' 'kinky,' and 'unclean,' Blacks … have been stigmatized for their naturally coiled hair."). Defendants' espousal of such derogatory views of Black hair—and their willingness to formulate policy based on them—is indicative of their intent to discriminate against Black individuals. *See Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 415 (5th Cir. 2015) (stating that a defendant's comment about "how much *you people* spend on your *ethnic* hair styles" was "clearly indicative of racial animus") (emphasis in original); *Chavez v. Ill. State Police*, 251 F.3d 612, 646 (7th Cir. 2001) ("[R]acially derogatory language is … strong evidence of racial

animus."); *Millin v. McClier Corp.*, No. 02 Civ. 6592, 2005 U.S. Dist. LEXIS 2024, at *17–19 (S.D.N.Y. Feb. 4, 2005) (holding that a reasonable factfinder could construe derogatory comments about the plaintiff's dreadlocks as related to his race); *cf. Batson v. Kentucky*, 476 U.S. 79, 104 (1986) (Marshall, J., concurring) ("[T]he Equal Protection Clause prohibits a State from taking any action based on crude, inaccurate racial stereotypes.").

*          *          *

"If equal protection means anything, it means that individuals may not be punished or rewarded based on the government's views regarding their racial group, regardless of the source of those views." *Floyd*, 959 F. Supp. 2d at 664. Whether Defendants' hair policy is viewed as classifying people by race on its face or not, Plaintiffs have satisfied the pleading requirements by alleging "enough facts to raise a reasonable expectation that discovery will reveal evidence" that Defendants intended to treat Black people differently from others when they formulated and enforced their policy. *See Walker*, 956 F.3d at 166. Plaintiffs' equal protection claim should proceed to discovery.

## V.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in full, and all of Plaintiffs' claims should proceed to discovery.

Respectfully submitted,

_/s/ Alexandra Morgan-Kurtz_
Alexandra Morgan-Kurtz
Attorney I.D. # PA 312631
PA INSTITUTIONAL LAW PROJECT
100 Fifth Ave, Suite 900
Pittsburgh, Pa 15222
T: 412-434-6175
amorgan-kurtz@pailp.org

_/s/ Matthew A. Feldman_
Matthew A. Feldman
Attorney I.D. # PA 326273
PA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
T: 215-925-2966
mfeldman@pailp.org

DATE: August 24, 2020

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.8(b)(2), I hereby certify that the word count of this brief is 7,494 words, less than the 7,500-word limit set by the Court in its Order of August 21, 2020 (ECF No. 33).  I relied on Microsoft Word's word-count feature to determine the word count.

> /s/ Matthew A. Feldman
> Matthew A. Feldman
> Attorney I.D. # PA 326273
> PA Institutional Law Project
> 718 Arch Street, Suite 304S
> Philadelphia, PA 19106
> T: 215-925-2966
> mfeldman@pailp.org

**CERTIFICATE OF SERVICE**

I, Matthew A. Feldman, hereby certify that on August 24, 2020, I caused to be served a true and correct copy of the foregoing Response in Opposition to Defendants' Motion to Dismiss upon Defendants' counsel via the Court's ECF system.

/s/ Matthew A. Feldman
Matthew A. Feldman
Attorney I.D. # PA 326273
PA INSTITUTIONAL LAW PROJECT
718 Arch Street, Suite 304S
Philadelphia, PA 19106
T: 215-925-2966
mfeldman@pailp.org

33