## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEONTTAYY AMIR PRATT and LAMONT ROBINSON, | : | CIVIL ACTION NO. 1:20-CV-171 |
| | : | |
| | : | (Judge Conner) |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL OTT, Deputy Warden of Operations, Lebanon County Correctional Facility; TINA LITZ, Deputy Warden of Treatment, Lebanon County Correctional Facility; ROBERT J. KARNES, Warden, Lebanon Correctional Facility; JOSEPH WHEELER, Captain of Security, Lebanon County Correctional Facility; and LEBANON COUNTY, | : | |
| | : | |
| Defendants | : | |

## **MEMORANDUM**

Plaintiffs Leonttayy Amir Pratt and Lamont Robinson filed this action seeking equitable and monetary relief for alleged violations of their civil rights committed by the Lebanon County Correctional Facility ("LCCF") and various LCCF administrators. Specifically, plaintiffs allege that LCCF punished them for refusing to cut off their dreadlocks—an act which would violate plaintiffs' sincerely held religious beliefs—and discriminated against them on the basis of race. Defendants move to dismiss three of plaintiffs' four claims under Federal Rule of Civil Procedure 12(b)(6). We will deny defendants' motion.

I.     **Factual Background & Procedural History**

Plaintiffs are two Black males currently incarcerated at LCCF—Pratt as a pretrial detainee, and Robinson as an alleged parole violator.  (See Doc. 22 ¶¶ 4-5).  Both men are Rastafarian.  (Id. ¶¶ 72, 106).  They describe Rastafarianism as "an Abrahamic religion that developed in Jamaica in the 1930s."  (Id. ¶ 15).  The religion is "deeply influenced by Judeo-Christian theology" and "based on an Afrocentric interpretation of the Bible."  (Id. ¶ 16).  According to plaintiffs, growing one's hair in dreadlocks "is central to many Rastafarians' religious expression."  (Id. ¶ 19).  Plaintiffs explain that dreadlocks are both "a symbol of strength and a means of connecting more closely with God," and that many Rastafarians believe their dreadlocks "connect them with their ancestors and family members who have died."  (Id. ¶¶ 21-22).  These beliefs are rooted, in part, in the Bible's "nazirite vow," which requires adherents to avoid cutting their hair.  (Id. ¶ 20).  Pratt and Robinson wear their hair in dreadlocks in accordance with their Rastafarian religious beliefs.  (Id. ¶¶ 76, 112).

LCCF's rules and regulations prohibit individuals confined there from wearing their hair in braids or cornrows.  (See id. ¶¶ 23, 45).  Other forms of long hair are allowed if the hair is "tied up or worn in a single pony tail."  (See id. ¶¶ 24, 46).  Although the rules and regulations do not explicitly ban dreadlocks, defendant Robert J. Karnes, the warden of LCCF, considers dreadlocks to be "braids."  (See id. ¶ 27).  According to Karnes, LCCF prohibits braids, cornrows, and dreadlocks as a matter of safety and hygiene, citing both the "ability to hide contraband" and the need "to ensure cleanliness in the correctional facility."  (See id. ¶ 33).  Plaintiffs

allege that dreadlocks are not inherently less hygienic than, and can be kept as clean as, any other hairstyle.  (<u>Id.</u> ¶ 34).  Before April 2020, LCCF did not offer a religious exemption for dreadlocks.  (<u>Id.</u> ¶ 30).  Pursuant to LCCF directive, individuals who refused to cut their dreadlocks were placed in the Security Housing Unit ("SHU").  (<u>See id.</u> ¶¶ 26, 31).

Both Pratt and Robinson were placed in the SHU for alleged violations of LCCF's hairstyle policy.  Pratt was admitted to LCCF on November 21, 2019, and was placed in the SHU the following day for refusing to cut his deadlocks.  (<u>See id.</u> ¶¶ 80-82).  Pratt offered to tie his hair up, but defendants advised that the "only way he would be transferred out of the SHU was if he cuts his dreadlocks off."  (<u>See id.</u> ¶¶ 87-90).  Pratt remained in the SHU for five months, until April 23, 2020.  (<u>See id.</u> ¶ 81).

Robinson was admitted to LCCF on October 30, 2019.  (<u>Id.</u> ¶ 117).  He was initially housed in general population notwithstanding his dreadlocks because he concealed them under a hat.  (<u>See id.</u> ¶¶ 118-119).  On or about February 15, 2020, defendant Joseph Wheeler, LCCF's captain of security, and other correctional officers searched the housing units for individuals with dreadlocks.  (<u>Id.</u> ¶¶ 39, 123).  Non-white individuals were "ordered . . . to remove their hats and shake out their hair, so staff could check for dreadlocks."  (<u>Id.</u> ¶ 40; <u>see id.</u> ¶ 123).  White individuals were not subjected to these searches.  (<u>Id.</u> ¶¶ 41, 124).  Robinson and other people of color who were found to have dreadlocks were told "to cut them off by 3:00 P.M. the next day or else they would be placed in the SHU."  (<u>See id.</u> ¶¶ 42, 125).  Robinson

refused and, on February 17, 2020, was placed in the SHU, where he remained until approximately May 18, 2020.  (Id. ¶¶ 128-129).

Neither Pratt nor Robinson received a hearing or any other opportunity to contest his placement in the SHU.  (Id. ¶¶ 84, 131).  Pratt alleges that his extended confinement in the SHU and its concomitant limitations on mobility and exercise significantly exacerbated preexisting physical injuries.  (See id. ¶¶ 95-99).  Both plaintiffs also allege deterioration of their mental health.  (See id. ¶¶ 101-104, 140-141).  Plaintiffs contend that, LCCF policy notwithstanding, at least two other individuals with dreadlocks were housed in general population rather than the SHU in 2019 and early 2020.  (See id. ¶ 38).

On April 23, 2020, LCCF revised its hairstyle policy.  (Id. ¶ 43).  The revised policy continues to prohibit individuals detained at LCCF from "wear[ing] their hair in braids, dreadlocks, cornrows[,] or other similar styles that present security or hygiene concerns."  (See id. ¶ 45 (first alteration in original)).  Plaintiffs allege that this policy, like its predecessor, singles out certain natural Black hairstyles.  (See id. ¶ 44).  The policy likewise still permits other forms of long hair so long as it is worn "'up' . . . in hair ties or a single ponytail."  (See id. ¶ 46).  Unlike the prior iteration, however, the prohibition against braids, dreadlocks, cornrows, and the like now includes an exemption for "inmates who have sincerely held religious beliefs requiring them to wear their hair in a style otherwise prohibited under this policy."  (See id. ¶ 47).  Pratt was released from the SHU and transferred to general population the day the revised policy was announced.  (See id. ¶ 105).  Robinson was released approximately one month later, around May 18, 2020, but his additional

4

time in the SHU is attributable to an unrelated misconduct citation.  (Id. ¶¶ 142-144).

Pratt commenced this action *pro se* on February 4, 2020, before LCCF revised its hairstyle policy.  Counsel thereafter entered an appearance and, on May 22, 2020, filed an amended complaint on behalf of both Pratt and Robinson.  In addition to Karnes and Wheeler, the amended complaint names Michael Ott (LCCF's deputy warden of operations), Tina Litz (its deputy warden of treatment), and Lebanon County as defendants.  Plaintiffs seek compensatory and punitive damages in addition to equitable relief for defendants' alleged violations of their civil rights.  Defendants have moved to dismiss the bulk of plaintiffs' amended complaint.  The motion is fully briefed and ripe for disposition.

## II.   **Legal Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted.  FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly,

550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts

a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31

(3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a

plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting

Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a

claim must be separated; well-pleaded facts are accepted as true, while mere legal

conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578

F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual

allegations, it must determine whether they are sufficient to show a "plausible claim

for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550

U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[]

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 556 U.S. at 678.

**III.**   **Discussion**

Plaintiffs allege violations of the Religious Land Use and Institutionalized

Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq.; the Free Exercise Clause

of the First Amendment; the Substantive Due Process Clause of the Fourteenth

Amendment; and the Equal Protection Clause of the Fourteenth Amendment.

Defendants move to dismiss all but the First Amendment claim.  We address

defendants' arguments seriatim.

**A.**   **RLUIPA Claim**

RLUIPA "prohibits a state or local government from taking any action that

substantially burdens the religious exercise of an institutionalized person unless the

government demonstrates that the action constitutes the least restrictive means of furthering a compelling governmental interest." Holt v. Hobbs, 574 U.S. 352, 355 (2015); see 42 U.S.C. § 2000cc-1(a).  RLUIPA defines "government" to include states, counties, municipalities, and other government entities created by the states as well as officials of those entities and persons acting under color of state law.  See id. § 2000cc-5(4).  The statute establishes a private right of action through which an aggrieved individual may "obtain appropriate relief against a government."  See id. § 2000cc-2(a).  The term "appropriate relief" includes equitable relief and, as to municipal defendants like Lebanon County, monetary damages.  See Sossamon v. Texas, 563 U.S. 277, 288 (2011) (holding that, because of sovereign immunity, "appropriate relief" cannot include damages against a state); McGill v. Clements, No. 3:19-CV-01712, 2021 WL 232599, at *3-4 (M.D. Pa. Jan. 22, 2021) (explaining that municipal entities do not share in state's sovereign immunity and may be liable for monetary damages under RLUIPA (citing Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 290 (5th Cir. 2012); Kelley Bey v. Keen, No. 3:13-CV-1942, 2014 WL 3563475, at *13 (M.D. Pa. July 17, 2014); Munic v. Langan, No. 4:CV-13-2245, 2015 WL 5530274, at *4 (M.D. Pa. Sept. 18, 2015))); Centro Familiar Cristiano Buenas Nuevas v. City of Yuma, 651 F.3d 1163, 1168-69 (9th Cir. 2011).

Defendants do not dispute that monetary damages are an available remedy against a municipal entity under RLUIPA.  (See generally Doc. 29 at 4-12; Doc. 36 at 2-9).  They instead posit that, because LCCF has amended its hairstyle policy to offer a religious exemption, and because plaintiffs no longer seek injunctive relief, (see Doc. 34 at 5 n.2), the RLUIPA claim is both nonjusticiable under the mootness

doctrine and barred by the statute's governmental-discretion provision, (see Doc. 29 at 4-12). The first argument is foreclosed by binding precedent: in Lighthouse Institute for Evangelism, Inc. v. City of Long Branch, 510 F.3d 253 (3d Cir. 2007), the Third Circuit Court of Appeals held that, while a corrective amendment to a challenged policy moots a request for injunctive relief under RLUIPA, "claims for compensatory damages and attorney fees . . . are not moot." Lighthouse, 510 F.3d at 260-61 (citing Donovan v. Punxsutawney Area Sch. Bd., 336 F.3d 211, 218 (3d Cir. 2003)). Neither our court of appeals nor the Supreme Court of the United States, however, has taken up defendants' second argument: that RLUIPA's governmental-discretion provision bars any cause of action under the statute once the offending policy has been revised.[1]

RLUIPA's governmental-discretion provision, sometimes referred to as its "safe-harbor" clause, appears in Section 2000cc-3(e), under the heading "Rules of construction" and the subheading "Governmental discretion in alleviating burdens on religious exercise." See 42 U.S.C. § 2000cc-3(e). The provision states, in full:

> A government may avoid the preemptive force of any provision of this chapter by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and

---

[1] The court of appeals did not address the governmental-discretion provision in Lighthouse. We have reviewed the appellate briefing, and it appears the governmental-discretion provision was not raised by any party. The Supreme Court also did not address this provision in Sossamon, nor was the issue raised in the briefing. Notably, the offending prison regulation in Sossamon was amended during the litigation and the Fifth Circuit Court of Appeals considered the issue of mootness, holding that the amendment mooted the plaintiff's RLUIPA claim for injunctive and declaratory relief but not the claim for monetary damages. See Sossamon v. Lone Star State of Texas, 560 F.3d 316, 324-26 (5th Cir. 2009).

> exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden.

Id. Defendants argue that the phrase "avoid the preemptive force" means the government may avoid *all* liability under RLUIPA—whether prospective (injunctive relief) or retrospective (monetary damages)—by amending the challenged policy. (See Doc. 29 at 4-8; Doc. 36 at 2-9). Plaintiffs counter that the word "preemptive" necessarily contemplates prospective relief only. (See Doc. 34 at 6-9).

Application of the governmental-discretion provision is problematic in that few cases have squarely addressed its contours. In Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752 (7th Cir. 2003), the Seventh Circuit held that a challenged ordinance did not substantially burden religious exercise. More relevant to the matter *sub judice*, it also held that when the city "eliminate[d the] nondiscrimination provision violation" by amending the ordinance, RLUIPA was "inapplicable" to the case. See Civil Liberties, 342 F.3d at 762. Although the Civil Liberties court did not opine that corrective action under the governmental-discretion provision forecloses all relief under RLUIPA in every case, some courts read the decision—incorrectly in our view—to sweep that broadly. See, e.g., Riverside Church v. City of St. Michael, 205 F. Supp. 3d 1014, 1031 (D. Minn. 2016) (stating that "Civil Liberties stands for the proposition that, under RLUIPA's safe harbor provision, a government can avoid liability under RLUIPA by amending its land use regulations to remove the allegedly burdensome or discriminatory provision, even after such provisions have caused harm"); Boles v. Neet, 402

F. Supp. 2d 1237, 1241 (D. Colo. 2005) (citing Civil Liberties for proposition that government may "take corrective action to eliminate any violation of the statutory provisions . . . and thereby preempt liability under RLUIPA"); see also Petra Presbyterian Church v. Village of Northbrook, 409 F. Supp. 2d 1001, 1008 (N.D. Ill. 2006) (concluding that village "avoided liability" under governmental-discretion provision by revising ordinance), aff'd on other grounds, 489 F.3d 846 (7th Cir. 2007).

Other courts have approached the issue differently.  At least one district court has held that the governmental-discretion provision does not eliminate the ability to sue for monetary damages incurred before the government took corrective action.  See Family Life Church v. City of Elgin, No. 07 CV 217, 2007 WL 2790763, at *5 (N.D. Ill. Sept. 24, 2007) ("[W]e do not read the RLUIPA or Civil Liberties to stand for the proposition that the corrective action can retroactively erase injuries already incurred as well as the corresponding ability to sue for damages.").  And still others, like our court of appeals in Lighthouse, have simply permitted claims for monetary damages to proceed notwithstanding corrective amendment or repeal without *sua sponte* raising the governmental-discretion provision.  See Lighthouse, 510 F.3d at 260-61, 272-73; see also Covenant Christian Ministries, Inc. v. City of Marietta, 654 F.3d 1231, 1244 (11th Cir. 2011) (concluding that amendment of ordinance mooted request for injunctive relief but not for monetary damages); Christian Assembly Rios de Agua Viva v. City of Burbank, 237 F. Supp. 3d 781, 794-96 (N.D. Ill. 2017) (same following repeal of ordinance).  We have not located any federal court decision, however, that has applied traditional tools of statutory

interpretation to the governmental-discretion provision to discern what Congress meant by it.  We will do so here.

Our interpretation begins, as it must, with the statutory language.  See In re Phila. Newspapers, LLC, 599 F.3d 298, 304 (3d Cir. 2010).  We presume that Congress "says in a statute what it means and means in a statute what it says there."  Id. (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992)).  If the statutory language is unambiguous, our inquiry ends.  See id.  In determining whether language is unambiguous, we "read the statute in its ordinary and natural sense," Da Silva v. Attorney Gen. U.S., 948 F.3d 629, 635 (3d Cir. 2020) (citation omitted)), considering "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole," Rosenberg v. XM Ventures, 274 F.3d 137, 141 (3d Cir. 2001) (citation omitted)).  When interpreting a statute, we "endeavor to give meaning to every word which Congress used and therefore should avoid an interpretation which renders an element of the language superfluous."  Id. (collecting cases).  The plain meaning controls except for the "rare case[] [in which] literal application of a statute will produce a result demonstrably at odds" with congressional intent.  See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242 (1989) (second alteration in original).

The phrase at issue here—"preemptive force"—is not defined in the statute, so we must consider its "ordinary or natural meaning."  See FDIC v. Meyer, 510 U.S. 471, 476 (1994); see also Da Silva, 948 F.3d at 635.  To do so, "[w]e refer to standard reference works such as legal and general dictionaries."  Da Silva, 948

F.3d at 635 (alteration in original) (quoting United States v. Geiser, 527 F.3d 288, 294 (3d Cir. 2008)).

*Black's Law Dictionary* does not define the adjective "preemptive," but it does define the noun "preemption." In *Black's*, "preemption" is defined as "[t]he principle (derived from the Supremacy Clause) that a federal law can supersede or supplant any inconsistent state law or regulation."[2] The *Oxford English Dictionary* does not define "preemptive" or "preempt" in any sense relevant here, but its legal definition of "preemption" accords with *Black's*: "[t]he overriding of one piece of legislation by another, typically of a state law by a federal one."[3] The *Merriam-Webster Dictionary* defines "preemption," in the legal sense, similarly to *Black's* and *Oxford*, and defines "preempt" as "to replace or supersede (a law) or bar (an action) by the doctrine of preemption" or "to prevent from happening or taking place."[4] It defines "preemptive" to mean "of or relating to preemption" and "having power to preempt."[5] The dictionaries define "force" to mean "[p]ower, violence, or pressure

---

[2] *Preemption*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[3] OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/149931? redirectedFrom=preemption#eid (last visited Mar. 27, 2021).

[4] See MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/ dictionary/preemption (last visited Mar. 27, 2021); MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/preempt (last visited Mar. 27, 2021).

[5] MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/ dictionary/preemptive (last visited Mar. 27, 2021).

directed against a person or thing,"[6] or "strength or energy exerted or brought to bear : cause of motion or change : active power."[7]

Based upon these definitions, we have little difficulty concluding that the term "preemptive force" as used in RLUIPA refers to the statute's power to preempt—to override, supersede, or replace—existing state and local laws, policies, or regulations.  Thus, the governmental-discretion provision means, and means only, that RLUIPA will not preempt state or local law if the government takes any of the steps enumerated in the provision for eliminating the alleged substantial burden on religious exercise.  See 42 U.S.C. § 2000cc-3(e).  The provision is, in essence, a federalism safety valve: as long as the challenged state or local law, policy, or regulation is amended to comport with RLUIPA, the latter will not preempt the former.  Relevant here, the effect is that we cannot apply RLUIPA's "preemptive force" to enjoin or declare invalid a municipal policy that has since been remedied in a manner contemplated by the governmental-discretion provision.  See Booker v. Engelke, No. 7:16cv00084, 2019 WL 1372165, at *5 (W.D. Va. Mar. 26, 2019) (stating that defendant may "avoid court-ordered prospective injunctive relief" by correcting policy under governmental-discretion provision (collecting cases)).  Defendants' suggestion that the provision extinguishes liability

---

[6] *Force*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[7] See MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/force (last visited Mar. 27, 2021).

for monetary damages incurred *before* they took corrective action finds no support in the statute's plain text.[8]

Our reading of the governmental-discretion provision aligns with the material legislative history of RLUIPA.  That history reflects a congressional intent to assure the states that RLUIPA does not require them to enact or abandon any particular law or policy; *per contra*, Congress intended to give each state the

---

[8] This interpretation is consistent with many of the cases to have applied the governmental-discretion provision to date—including several cases cited by defendants.  In a number of those cases, monetary damages were foreclosed on other legal grounds; the only remaining remedy under RLUIPA was prospective injunctive relief, which was foreclosed by corrective action taken pursuant to the governmental-discretion provision.  See Boles, 402 F. Supp. 2d at 1240-41 (first concluding that RLUIPA relief against state and its officials "must be limited to injunctive or declaratory relief" before holding that corrective action taken pursuant to governmental-discretion provision otherwise mooted claim); Dyer v. Osterhout, No. 15-12867, 2018 WL 4576674, at *3-4 (E.D. Mich. Sept. 25, 2018) (first holding that damages were not available against state officials in their official or individual capacities before noting that RLUIPA "also includes a safety valve allowing governments to avoid liability by changing offending policies"); see also AlAmiin v. Morton, 528 F. App'x 838, 842 (10th Cir. 2013) (nonprecedential) (citing governmental-discretion provision to find halal-meal claim moot when burden on religious exercise had been lifted and the "only available relief" against the state prison official defendant was prospective); Henderson v. Muniz, No. 14-CV-1857-JST, 2017 WL 6885394, at *13-15 (N.D. Cal. Nov. 28, 2017) (citing governmental-discretion provision and holding state defendants' authorization of daily prayers and certain religious rituals constituted corrective action and thus rendered moot plaintiff's claims for injunctive relief); Monson v. Steward, No. 2:15-CV-00513-PK, 2017 WL 2882709, at *6 (D. Or. July 6, 2017) (concluding that state officials were immune from monetary damages and their agreement to provide plaintiff with requested kosher diet rendered claims for injunctive and declaratory relief moot under governmental-discretion provision); Bilal v. Lehman, No. C04-2507 JLR, 2006 WL 3626808, at *4 (W.D. Wash. Dec. 8, 2006) (citing governmental-discretion provision and concluding that plaintiff's claims for injunctive relief against state defendants were moot after defendants agreed to provide halal meals).  We concur with these distinguishable decisions: if monetary damages are unavailable as a matter of law, as in the case of a defendant shielded by sovereign immunity, and the offending provision has been adequately remedied by corrective action, the governmental-discretion provision effectively moots any RLUIPA claim.

freedom "to choose its own means of eliminating substantial burdens on religious exercise."  <u>See</u> 146 Cong. Rec. E1563, E1564 (daily ed. Sept. 21, 2000) (statement of sponsoring Rep. Canady).  The congressional record reveals that RLUIPA was intended to "preempt[] laws that unnecessarily burden the exercise of religion, but it does not require the states to enact or enforce a federal regulatory program."  <u>Id.</u> Another statement confirms that RLUIPA "preempts certain laws and practices that discriminate against or substantially burden religious exercise," but "leaves all other policy choices to the states."  <u>See</u> 146 Cong. Rec. S7774, S7776 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy).  Congress plainly intended to allow each state to "eliminate the discrimination or burden in any way it chooses, so long as the discrimination or substantial burden is actually eliminated."[9]  <u>See</u> <u>id.</u> These assurances are principally codified in the governmental-discretion provision, but are also embodied elsewhere in RLUIPA.  <u>See</u> 42 U.S.C. § 2000cc-3(h) ("Nothing in this chapter shall be construed to preempt State law, or repeal Federal law, that is equally as protective of religious exercise as, or more protective of religious exercise than, this chapter.").

---

[9] Other courts, while not specifically applying the governmental-discretion provision or examining congressional intent, have noted a similar understanding of its purpose.  <u>See, e.g.</u>, <u>Fox v. Washington</u>, 949 F.3d 270, 277 (6th Cir. 2020) (noting governmental-discretion provision offers government "several options" to remedy any offending policy or practice); <u>Mintz v. Roman Cath. Bishop of Springfield</u>, 424 F. Supp. 2d 309, 325-26 (D. Mass. 2006) (noting that municipal zoning board "had the option, albeit not an obligation," under governmental-discretion provision to refuse to enforce offending bylaw).

Our interpretation of the phrase "preemptive force" is in accord with jurisprudential usage of the term.  See Morissette v. United States, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art . . . , it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."); see, e.g., Cuomo v. Clearing House Ass'n, 557 U.S. 519, 526-29 (2009) (considering judicial meaning of "visitation" when National Bank Act was passed to determine meaning of that term as used in act).  The phrase "preemptive force" has been used by the Supreme Court in more than three dozen majority opinions—28 of them predating RLUIPA's enactment.  We have reviewed each of these cases, and the phrase "preemptive force"[10] has only ever been utilized by the Supreme Court in terms of a federal statute's ability to preempt state action under the Supremacy Clause.  Congress had never used the phrase "preemptive force" prior to its inclusion in RLUIPA, and it is reasonable to assume Congress intended to borrow this usage from the case law concerning federal preemption. Had Congress intended for corrective action under the governmental-discretion

---

[10] The phrase was first used by the Supreme Court in Arkansas Electric Co-op Corp. v. Arkansas Public Service Commission, 461 U.S. 375 (1983), in which the Court held that even though the Federal Power Commission determined it did not have jurisdiction under the Federal Power Act over wholesale rates charged by power cooperatives, the Act would still preempt state regulation, since "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *unregulated*, and in that event would have as much pre-emptive force as a decision *to* regulate."  Ark. Elec. Co-op Corp., 461 U.S. at 384.

provision to extinguish all relief under the private right of action established elsewhere in the statute, it could have more simply stated so.

The purposes of the governmental-discretion provision are clear: it assures the states that they retain discretion to decide how best to remedy an allegedly offending law, policy, or regulation, and it clarifies that RLUIPA will not *ipso facto* preempt an offending provision so long as the government accommodates the religious interest at issue.  Nothing in the plain language of RLUIPA, its legislative history, or judicial treatment of the term "preemptive force" suggests an intent to foreclose all liability or damages.  We therefore reject defendants' argument that RLUIPA's governmental-discretion provision eliminates all legal remedies under the statute in this case.  While Pratt and Robinson may no longer pursue injunctive relief under RLUIPA, they may pursue monetary damages and attorney's fees.  Accordingly, we will deny defendants' motion to dismiss plaintiffs' RLUIPA claim.

## B.  Substantive Due Process Claim

Defendants next ask the court to dismiss plaintiffs' Fourteenth Amendment substantive due process claim.  Defendants invoke the more-specific-provision rule, given plaintiffs' standalone cause of action under the Free Exercise Clause.  (See Doc. 29 at 12-14).  Plaintiffs rejoin that the two claims are distinct, involving different facts and different legal theories, so they may proceed under both their First and Fourteenth Amendment claims.  (See Doc. 34 at 17).

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV,

§ 1.  The clause contains both procedural and substantive components, the latter of which "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'"  Zinermon v. Burch, 494 U.S. 113, 125 (1990) (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).  Relevant here, the clause protects against punishment of a pretrial detainee "prior to an adjudication of guilt in accordance with due process of law" as part of its substantive protections.  Bell v. Wolfish, 441 U.S. 520, 535 (1979).

The Supreme Court established the more-specific-provision rule to deter unnecessary expansion of substantive due process claims.  See Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 260 (3d Cir. 2010) (citing County of Sacramento v. Lewis, 523 U.S. 833, 843-44 (1998)).  The rule holds that when "a constitutional claim is covered by a specific constitutional provision, . . . [it] must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  Wharton v. Danberg, 854 F.3d 234, 246 (3d Cir. 2017) (quoting United States v. Lanier, 520 U.S. 259, 272 n.7 (1997)); see also Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).

In the present case, plaintiffs' First and Fourteenth Amendment claims are materially different causes of action.  Each claim is premised on a separate legal theory supported by its own factual basis.  The First Amendment claim is based on defendants' inhibition of plaintiffs' right to free exercise by forcing them to choose between remaining in the SHU or violating their religious beliefs by cutting off their dreadlocks.  See, e.g., DeHart v. Horn, 227 F.3d 47, 51-52 (3d Cir. 2000) (en banc).  In

contrast, plaintiffs' Fourteenth Amendment claim is based on their rights as pretrial detainees to be free from punishment, and their view that detention in the SHU was tantamount to punishment.  See, e.g., Bell, 441 U.S. at 538-39.  The First Amendment claim is not more specific than the Fourteenth Amendment claim; it is distinct from it.[11]  See, e.g., McGill, 2021 WL 232599, at *5 (holding that pretrial detainees challenging punitive segregation under LCCF's hairstyle policy could maintain both free exercise and substantive due process claims).  We will deny defendants' motion to dismiss plaintiffs' Fourteenth Amendment claim.

## C.   Equal Protection Claim

Defendants argue that plaintiffs have failed to allege a Fourteenth Amendment equal protection claim.  (See Doc. 29 at 14-18).  The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  To state a race-discrimination claim under this clause, plaintiffs must allege that they were treated differently from others who were similarly situated and that the unequal treatment was the result of intentional discrimination.  Hassan v. City of New York, 804 F.3d 277, 294, 298 (3d Cir. 2015).  To be "similarly situated" means to be "alike 'in all relevant aspects.'"  Startzell v. City of Philadelphia, 533

---

[11] The only case cited by defendants involved a convicted prisoner—not a pretrial detainee—who could not pursue a punitive detention claim under the Fourteenth Amendment.  See Hennis v. Tedrow, No. 10-CV-445, 2011 WL 1230337 (W.D. Pa. March 31, 2011) (dismissing claim under more-specific-provision rule when Rastafarian prisoner brought both First and Fourteenth Amendment claims regarding misconduct report filed against him for refusing to cut his dreadlocks).

F.3d 183, 203 (3d Cir. 2008) (quoting <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 10 (1992)).  As

our court of appeals has explained,

> [i]ntentional discrimination can be shown when: (1) a law
> or policy explicitly classifies citizens on the basis of race;
> (2) a facially neutral law or policy is applied differently on
> the basis of race; or (3) a facially neutral law or policy that
> is applied evenhandedly is motivated by discriminatory
> intent and has a racially discriminatory impact.

<u>Doe v. Lower Merion Sch. Dist.</u>, 665 F.3d 524, 543 (3d Cir. 2011) (quoting <u>Antonelli</u>

<u>v. New Jersey</u>, 419 F.3d 267, 274 (3d Cir. 2005) (internal citations omitted)).

Relevant here, "[t]he Equal Protection Clause 'prohibits selective

enforcement of the law based on considerations such as race.'" <u>Thomas v. Indep.</u>

<u>Township</u>, 463 F.3d 285, 297 (3d Cir. 2006) (quoting <u>Whren v. United States</u>, 517 U.S.

806, 813 (1996)).  To survive a motion to dismiss, plaintiffs need only allege that

defendants applied the policy to them "with a greater degree[] of severity" than

individuals of other races.  <u>See</u> <u>Hassan</u>, 804 F.3d at 294 (alteration in original).

Plaintiffs clearly allege in the amended complaint that, *inter alia*, the

hairstyle policy at LCCF was applied differently on the basis of race.  Specifically,

plaintiffs allege that officials at LCCF required individuals of color to remove their

head coverings and hats so that officials could inspect them for compliance with

the hairstyle policy.  White individuals were not subjected to these searches.  This

distinction demonstrates that even if the policy is facially neutral, it is plausible that

officials applied it differently or more severely on the basis of race.  Therefore, the

court will deny defendants' motion to dismiss plaintiffs' equal protection claim.

**IV.**   **Conclusion**

For the foregoing reasons, the court will deny defendants' motion to dismiss.

An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    March 31, 2021